Argued and submitted November 20, 2000; resubmitted en banc April 11, dismissed September 26, 2001

Jordan UTSEY
and Melanie Tang,
*Respondents,*

*and*

LEAGUE OF WOMEN VOTERS
OF COOS COUNTY,
*Petitioner,*

*v.*

COOS COUNTY,
Albert Lillie, Cindy Lillie, and
Department of Land Conservation and Development,
*Respondents.*

2000-06; CA A111594

32 P3d 933

Douglas M. DuPriest argued the cause for petitioner League of Women Voters of Coos County. With him on the briefs was Hutchinson, Anderson, Cox, Coons & DuPriest, P.C. With him on the reply brief was Michelle A. Blackwell.

Allen L. Johnson argued the cause for respondents Albert Lillie and Cindy Lillie. With him on the brief was Johnson & Sherton, P.C.

Hardy Myers, Attorney General, Michael D. Reynolds, Solicitor General, and Denise G. Fjordbeck, Assistant Attorney General, filed the brief for respondent Department of Land Conservation and Development.

No appearance for respondents Jordan Utsey and Melanie Tang.

No appearance for respondent Coos County.

Before Deits, Chief Judge, and Edmonds, Landau, Haselton, Armstrong, Linder, Wollheim, Kistler, and Brewer, Judges.

LANDAU, J.

Edmonds, J., concurring.

Deits, C. J., dissenting.

Armstrong, J., dissenting.

Brewer, J., dissenting.

## LANDAU, J.

Intervenor, the League of Women Voters of Coos County (League), petitions for judicial review of a decision of the Land Use Board of Appeals (LUBA) upholding a decision of Coos County (county) to permit the operation of an off-highway vehicle (OHV) trail system and an OHV "motocross" racetrack as a "private park" on a tract of land that is zoned exclusive farm use (EFU). Respondents Albert and Cindy Lillie, the applicants for the permit, move to dismiss the petition as nonjusticiable. We agree and dismiss.

The relevant facts are not in dispute. The Lillies applied to the county for a conditional-use permit for an "OHV Recreational Trail System Park" on their 531-acre tract of land, which is zoned, among other things, EFU. The Lillies proposed that the park be approved as a "private park," which is a conditionally permitted use in EFU zones under ORS 215.283(2)(c). The county conducted an evidentiary hearing, at which neighboring property owners appeared in opposition to the application. The League filed a letter in opposition as well. The letter did not identify what the League is, nor did it provide any explanation of its interest in the Lillies' application. The letter simply stated that the League opposed the application on the ground that approval would be unlawful. The county ultimately approved the application with conditions.

Some of the neighboring property owners appealed to LUBA. The League filed a motion to intervene in the appeal. The motion was made on behalf of the League itself; the League did not purport to act in a representative capacity with respect to any of its individual members. The motion provided no explanation as to what the League is, nor did it provide any explanation as to the nature of the League's interest in the appeal. The stated grounds for the motion were, in their entirety, that

"[t]he facts establishing movant's right to intervene are that movant appeared in the proceeding below and filed a letter of objection in the proceeding."

LUBA allowed the motion to intervene and ultimately affirmed the county's decision in part and reversed and remanded in part.

The League—and only the League—now seeks review of LUBA's decision, arguing that land devoted to an OHV trail system and a motocross racetrack cannot be considered a "private park." The Lillies contend that the League's petition is not justiciable. According to the Lillies, the record fails to establish that the League will sustain any "direct or indirect, personal or representative" effects from the outcome of this proceeding. The League does not deny that. Instead, it contends that, under ORS 197.830(2) and (7), because it appeared in the county proceedings, it is authorized to appeal the county's decision, and, under ORS 197.850(1), any party to a LUBA proceeding may seek judicial review by this court. The Lillies reply that, although the League may have standing within the meaning of those statutes, its petition nevertheless is nonjusticiable because it has only an abstract interest in the outcome of the case. The Lillies do not contest that the League has satisfied the statutory standing requirements of ORS 197.830 and ORS 197.850. They nevertheless contend that statutory standing does not necessarily establish that a claim is constitutionally justiciable and that, in this case, because the League has no concrete interest in the outcome of the case, its claim is nonjusticiable as a matter of constitutional law.

The arguments of the parties thus raise the question whether a legislative conferral of standing is sufficient to establish the justiciability of a claim; said another way, the question is whether the constitution imposes limits on the authority of the legislature to confer a right to seek judicial review. To answer that question first requires a careful examination of the nature of the requirement that a party's claim must be "justiciable" and then an exploration of the nature of the legislature's authority to enact statutes that affect the justiciability of a given claim.

At the outset, we must be candid: The cases concerning the constitutional requirements of justiciability are murky at best; at times, they are flatly contradictory. Answering the question posed to us in this case, therefore,

requires more than simply selecting a prior decision of this court or the Oregon Supreme Court, because, frankly, any number of cases may be cited to support any number of different outcomes. In consequence, rather than simply select a decision favorable to one outcome or another, we endeavor to return to first principles, *see Priest v. Pearce,* 314 Or 411, 415-16, 840 P2d 65 (1992), so that we may evaluate which among the prior cases represents the interpretation of the Oregon Constitution that is consistent with the meaning likely intended by those who ratified it.

The term "justiciable"—along with its companion terms "standing," "mootness," and "ripeness"—does not appear in the Oregon Constitution. Indeed, none of the terms appears in the case law until shortly after the turn of the last century. They are, in brief, judicial constructs, developed first in reference to the "judicial power" conferred on federal courts under Article III of the United States Constitution and later adopted by the Oregon courts in reference to the "judicial power" conferred under Article VII (Amended) of the state constitution.

The orthodox view is that the genealogy of modern doctrines of justiciability traces back to the era of the framers of the federal constitution.[1] Three sources are commonly cited: *Hayburn's Case,* 2 US (Dall) 408, 1 L Ed 436 (1792); *Marbury v. Madison,* 5 US (Cranch) 137, 2 L Ed 60 (1803); and a letter from Chief Justice Jay to President Washington.[2]

---

[1] The rule that courts will not render judgment in the absence of an immediate or threatened injury to the plaintiff actually is much older, having roots in the English common law. *See, e.g.,* James E. Radcliffe, *The Case-or-Controversy Provision* at 202 (1978); Eric B. Schnurer, Note, *"More than an Intuition, Less than a Theory": Toward a Coherent Doctrine of Standing,* 86 Colum L Rev 564, 570 (1986). The New York Court of Appeals, for example, has noted that "the principle that only proper parties will be allowed to maintain claims is an ancient one, long predating the Federal Constitution." *The Society of the Plastics Industry, Inc. v. County of Suffolk,* 77 NY2d 761, 772, 573 NE2d 1034 (1991). *See also Doolittle v. Board of Supervisors of Broome,* 16 How Pr 512, 520 (1858) ("No private person or number of persons can assume to be the champions of the community, and in its behalf challenge the public officers to meet them in the courts of justice to defend their official acts."); *Bigelow v. The Hartford Bridge Co.,* 14 Conn 565, 578 (1842) ("To preserve and enforce the rights of persons, as individuals, and not as members of the community at large, is the very object of all suits, both at law and in equity.").

[2] Also occasionally cited is a reference in Madison's notes from the Constitutional Convention that the jurisdiction of Article III courts "was constructively limited to cases of a Judiciary nature." 2 The Records of the Federal Convention of

In *Hayburn's Case,* three members of the Court, acting in their capacities as circuit judges, issued separate opinions on the constitutionality of a statute that authorized the courts to determine the pension eligibility of veterans, subject to the review of the Secretary of War and Congress. Each of the opinions concluded that the statute was unconstitutional, on the ground that the legislative branch cannot assign to the courts any duties that are not "judicial" in nature. According to each of the opinions, decisions that are subject to review by the executive or legislative branches are not final, and one of the defining characteristics of a "judicial" decision is that it have finality.[3] The Supreme Court ultimately declined to rule on the matter because, in the meantime, Congress changed the statute, and the matter became academic.

In *Marbury,* as every law student knows, the Court was concerned that the issuance of a writ of mandamus to the Secretary of State to deliver Marbury's commission might be perceived as an attempt to "intermeddle with the prerogatives of the executive." 5 US (Cranch) at 170. The court disclaimed that intention, explaining:

---

1787 at 430 (Max Farrand ed 1911). *See generally* Robert J. Pushaw, Jr., *Justiciability and Separation of Powers: A Neo-Federalist Approach,* 81 Cornell L Rev 393, 426 (1996).

[3] In response to the circuit judges' opinions, Attorney General Edmond Randolph asked the Supreme Court to issue a writ of mandamus ordering the circuit courts to act under the statute. Randolph acted without a client, filing the motion solely in his official capacity. The Court responded by asking him whether he had the right to ask the Court for any relief. Randolph argued that he had the right to request relief merely because he was Attorney General. The Court rejected his argument by a 3-3 vote. Randolph then appeared as counsel for Hayburn, at which point the Court decided to take up the mandamus petition. As a result, the case frequently has been cited as a progenitor of modern standing doctrine. *See, e.g., University of California Regents v. Bakke,* 438 US 265, 410, 98 S Ct 2733, 57 L Ed 2d 750 (1978) (Stevens, J., dissenting in part); *Anti-Fascist Committee v. McGrath,* 341 US 123, 150, 71 S Ct 624, 95 L Ed 817 (1951) (Frankfurter, J., concurring); *Rochester Tel. Corp. v. United States,* 307 US 125, 131 n 9, 59 S Ct 754, 83 L Ed 1147 (1939). More recent scholarship—based on an examination of the justices' notes—suggests that the Court may not have intended such a broad reading of the decision. *See generally* Maeva Marcus and Robert Teir, *Hayburn's Case: A Misinterpretation of Precedent,* 1988 Wisc L Rev 527. That, however, has not stopped the Court from continuing to cite the case as authority for the proposition that federal courts lack constitutional authority to issue advisory opinions. *See, e.g., Steel Co. v. Citizens for Better Environment,* 523 US 83, 101, 118 S Ct 1003, 140 L Ed 2d 210 (1998).

"It is scarcely necessary for the court to disclaim all pretentions to such a jurisdiction. An extravagance, so absurd and excessive, could not have been entertained for a moment. *The province of the court is, solely, to decide on the rights of individuals,* not to inquire how the executive, or executive officers, perform duties in which they have a discretion."

*Id.* (emphasis added).

Finally, in what is commonly referred to as "the Correspondence of the Justices," the Court responded to an inquiry by Secretary of State Thomas Jefferson regarding whether, in considering treaties and laws, the President could "be availed of [the Supreme Court's] advice on these questions." Henry P. Johnston ed, 3 The Correspondence and Public Papers of John Jay, 487 (1891). The Justices declined to provide the advice, on the ground that providing extra-judicial advisory opinions implicated "the lines of separation drawn by the Constitution between the three departments of the government." *Id.* at 488.

According to the orthodox view, those three sources reflect an early concern that the "judicial power" be restricted to deciding actual cases between individuals with a stake in the outcome and that executive or legislative attempts to confer on the judiciary authority to go beyond that implicate core principles of the separation of powers. To be sure, some scholars have questioned that broad reading of the sources, *see, e.g.,* Robert J. Pushaw, Jr., *Justiciability and Separation of Powers: A Neo-Federalist Approach,* 81 Cornell L Rev 393 (1996); Raoul Berger, *Standing to Sue in Public Actions: Is It a Constitutional Requirement?,* 78 Yale LJ 816 (1969); Louis L. Jaffe, *The Citizen as Litigant in Public Actions: The Non-Hohfeldian or Ideological Plaintiff,* 116 U Pa L Rev 1033 (1968), although even those revisionists concede that at least *Marbury* plausibly supports the traditional view. *See, e.g.,* Pushaw, 81 Cornell L Rev at 479.[4] It is an interesting historiographical point, but ultimately an academic one. The

---

[4] The argument that *Marbury* cannot be read to endorse a more limited view of the judicial power generally involves concluding that the case cannot be taken to mean what it says, given that Marshall used it to deliver an essentially gratuitous, advisory opinion. *See, e.g.,* Martin H. Redish, *The Federal Courts in the Political Order: Judicial Jurisdiction and American Political Theory* at 91 (1991) ("although there can be little dispute about the facial import of the above-quoted passages, it

important point is that the courts ultimately accepted the broader view.

Beginning in the early twentieth century, the federal courts began more explicitly to define the limits of the "judicial power" conferred under Article III. The early cases arose under the federal Declaratory Judgment Act. At least as early as 1911, in *Muskrat v. United States,* 219 US 346, 31 S Ct 250, 55 L Ed 246 (1911), the Supreme Court held that, although Congress may have enacted legislation authorizing individuals to seek a declaratory judgment from the courts, the judicial power conferred under the constitution permits courts to render such relief only in cases in which the parties have concrete and adverse interests in the outcome. *See also Electric Bond Co. v. Comm'n,* 303 US 419, 58 S Ct 678, 82 L Ed 936 (1938); *Ashwander v. Valley Authority,* 297 US 288, 324, 56 S Ct 466, 80 L Ed 688 (1936); *New Jersey v. Sargent,* 269 US 328, 46 S Ct 122, 70 L Ed 289 (1926).

Outside the context of the Declaratory Judgment Act, the Court invoked the same principle. In *Massachusetts v. Mellon,* 262 US 447, 43 S Ct 597, 67 L Ed 1078 (1923), the Court rejected a suit brought by a taxpayer to enjoin a federal spending program. The Court explained that

> "[t]he party who invokes the [judicial] power must be able to show not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as a result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally."

*Id.* at 488. Similarly, in *Ex Parte Levitt,* 302 US 633, 58 S Ct 1, 82 L Ed 493 (1937), the Court rejected an individual's standing to claim that Hugo Black was ineligible to serve on the Supreme Court. Citing *Mellon,* the Court explained:

> "It is an established principle that to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained or is immediately in danger of sustaining a direct

---

is quite conceivable that Marshall's words should not be taken at face value"); Pushaw, 81 Cornell L Rev at 479 (reliance on *Marbury* as authority for limited judicial power "is ironic because Marshall actually issued a gratuitous political broadside against the President").

injury as the result of that action and it is not sufficient that he has merely a general interest common to all members of the public."

*Id.* at 634.

The Court justified its reliance on the doctrine of justiciability by reference to the intentions of the framers of the constitution. Perhaps most famous in that regard is Justice Frankfurter's concurring opinion in *Coleman v. Miller,* 307 US 433, 59 S Ct 972, 83 L Ed 1385 (1939), in which he explicitly invoked *Hayburn's Case* and the Correspondence of the Justices in support of the principle that the judicial power may be invoked only by one with a concrete stake in the outcome of a decision. *Id.* at 462-64 (Frankfurter, J., concurring).

To be sure, the Court flirted, at least briefly, with the notion that *Mellon* and its progeny were wrong. *Flast v. Cohen,* 392 US 83, 88 S Ct 1942, 20 L Ed 2d 947 (1968), in fact, expressly questioned *Mellon.* But more recently, *Flast* itself has been questioned, and the Supreme Court now consistently relies on *Mellon, Levitt,* and the historical justification articulated by Justice Frankfurter in *Coleman. See, e.g., Valley Forge College v. Americans United,* 454 US 464, 480-81, 102 S Ct 752, 70 L Ed 2d 700 (1982) (relying on *Mellon* and limiting *Flast* to a narrow "exception" to the concrete injury requirement); *Schlesinger v. Reservists to Stop the War,* 418 US 208, 220, 94 S Ct 2925, 41 L Ed 2d 706 (1974) (recognizing the "continued vitality" of *Levitt* and *Mellon*).

■ ■ More recent cases have even recognized additional aspects of justiciability that are not necessarily required by the federal constitution. As a result, under current federal law, justiciability involves two layers of limitations. First, there are the traditional constitutional limitations, which amount to "the immutable requirements of Article III." *Bennett v. Spear,* 520 US 154, 162, 117 S Ct 1154, 137 L Ed 2d 281 (1997). Those constitutional limitations include the "standing" requirement, now composed of three distinct parts:

"[T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized and (b) 'actual

or imminent, not "conjectural" or "hypothetical." ' Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' "

*Lujan v. Defenders of Wildlife,* 504 US 555, 560-61, 112 S Ct 2130, 119 L Ed 2d 351 (1992) (citations omitted). The "irreducible constitutional minimum" is just that. It cannot be abrogated or modified by legislation. *Bennett,* 520 US at 162. For example, Congress may enact a "citizen suit" provision authorizing any person to seek enforcement of a statute, but, as the Court has made clear, "Art[icle] III's requirement remains: the plaintiff still must allege a distinct and palpable injury to himself." *Warth v. Seldin,* 422 US 490, 501, 95 S Ct 2197, 45 L Ed 2d 343 (1975).[5]

Second, in addition to the traditional, constitutional limitations, the federal courts have created "prudential" limitations that amount to "self-imposed limits on the exercise of federal jurisdiction." *Allen v. Wright,* 468 US 737, 751, 104 S Ct 3315, 82 L Ed 2d 556 (1984). For example, federal courts often conclude that, although a plaintiff has "standing" in the constitutional sense, they will not exercise jurisdiction because the plaintiff's grievance does not fall within "the zone of interests" protected by the statutory provision invoked in the suit. *Id.* Unlike their constitutional counterparts, the

---

[5] The Supreme Court typically invokes separation of powers principles to justify the rule that the legislative branch cannot confer on individuals the right to vindicate the public interest in court in the absence of a personal stake in the outcome:

"Whether the courts were to act on their own, or at the invitation of Congress, in ignoring the concrete injury requirement * * *, they would be discarding a principle fundamental to the separate and distinct constitutional role of the Third Branch. * * * 'The province of the court,' as Chief Justice Marshall said in *Marbury v. Madison,* 'is solely to decide on the rights of individuals.' Vindicating the *public* interest (including the public interest in Government observance of the Constitution and laws) is the function of Congress and the Chief Executive."

*Lujan,* 504 US at 576 (emphasis in original; citations omitted); *see also Allen v. Wright,* 468 US 737, 752, 104 S Ct 3315, 82 L Ed 2d 556 (1984) ("the law of * * * standing is built on a single basic idea—the idea of separation of powers").

prudential limitations are subject to legislative modification; thus, to return to the example, Congress could determine that satisfaction of a zone of interest requirement is not required, and the courts would be obligated to hear the case if it otherwise complied with constitutional limitations. *Bennett,* 520 US at 154.[6]

Oregon justiciability doctrine followed a similar path of development. As we have noted, the Oregon Constitution does not expressly mention justiciability, much less standing. It does, however, confer on the courts the "judicial power." The question is what the framers likely intended that to mean. *Priest,* 314 Or at 415-16. In light of the case law that existed up to the adoption of the original Article VII in 1857— and even the amended version in 1910—it is likely that the framers would have understood the judicial power to conform to the limited, private rights model of adjudication that is reflected in early federal cases such as *Marbury* ("The province of the court is, solely, to decide on the rights of individuals, not to inquire how the executive, or executive officers, perform duties in which they have a discretion."), 5 US

---

[6] The more recent of the Supreme Court's standing cases have generated quite a bit of controversy in academic circles. *Lujan,* in which the Court expressly held that Congress cannot confer standing on individuals who cannot satisfy the constitutional injury requirement, has been singled out for especially searching criticism. Nearly all of *Lujan's* critics, however, attack the Court's premise that there is an injury requirement in the first place, not the Court's conclusion that, if such a requirement exists as a matter of constitutional law, Congress cannot abrogate it. *See, e.g.,* Cass R. Sunstein, *What's Standing After* Lujan? *Of Citizen Suits, "Injuries," and Article III,* 91 Mich L Rev 163 (1992). Some critics of the injury requirement of federal standing doctrine contend that it is not supported by the historical record, *see, e.g.,* Berger, 78 Yale LJ at 839, although there is no scholarly consensus on the point, *see, e.g.,* Bradley S. Clanton, *Standing and the English Prerogative Writs: The Original Understanding,* 63 Brook L Rev 1001 (1997), which even critics acknowledge, *see, e.g.,* Gene R. Nichol, *The Impossibility of Lujan's Project,* 11 Duke Envtl L & Pol'y F 193, 199 (2001). Others suggest that, regardless of what the framers may have intended, justiciability is simply a social construction that reflects inevitable policy choices, and so courts should feel free to adopt a more "public rights" oriented model of adjudication developed in academic literature during the 1970s. *See, e.g.,* Helen Hershkoff, *State Courts and the "Passive Virtues": Rethinking the Judicial Function,* 114 Harv L Rev 1833, 1841-42 (2001). The academic response to the Supreme Court's standing jurisprudence, however, has been far from unanimous. Others suggest that the Court's recent decisions, including *Lujan,* are supported by history, logic, and democratic theory. *See, e.g.,* John G. Roberts, Jr., *Article III Limits on Statutory Standing,* 42 Duke LJ 1219 (1993); Harold J. Krent and Ethan G. Shenkman, *Of Citizen Suits and Citizen Sunstein,* 91 Mich L Rev 1793 (1993).

(Cranch) at 170, and state decisions such as *Doolittle* ("No private person or number of persons, can assume to be the champions of the community, and in its behalf challenge the public officers to meet them in the courts of justice to defend their official acts."), 16 How Pr at 520, and *Bigelow* ("To preserve and enforce the rights of persons, as individuals, and not as members of the community at large, is the very object of all suits, both at law and in equity."), 14 Conn at 578.

Early cases reflect that reading of the state constitution. Indeed, the Oregon courts began by simply adopting existing federal law. As in the case of the federal decisions, Oregon courts first addressed the issue of justiciability in the declaratory judgment context. The leading case is *Oregon Cry. Mfgs. Ass'n v. White,* 159 Or 99, 78 P2d 572 (1938), in which the plaintiffs, dairy processors and distributors challenged the constitutionality of the Oregon Agricultural Marketing Act, which had not yet been applied to them. The court held that the matter was not justiciable. Notwithstanding that the plaintiffs had brought their suit under the declaratory judgment statute, the court held, the judicial power conferred by the Oregon Constitution permits courts to grant relief only when the party seeking it presents a justiciable controversy. The plaintiffs argued that their difference of opinion with the Department of Agriculture as to the constitutionality of the statute sufficed. The court disagreed: "Courts * * * insist upon an actual controversy—not a mere difference of opinion concerning the validity of a statute— before jurisdiction will be assumed." *Id.* at 111. The court quoted from and relied on such federal decisions as *Electric Bond Co.* and *New Jersey v. Sargent* and, like those federal decisions, explicitly set its decision on constitutional footing. *Oregon Cry. Mfgs. Ass'n,* 159 Or at 109. According to the court, the "judicial power" conferred by the Oregon Constitution simply does not include rendering an advisory opinion that will have no practical effect on the party invoking the court's jurisdiction. *Id.*

Similarly, in *Eacret et ux v. Holmes,* 215 Or 121, 333 P2d 741 (1958), the plaintiffs, the parents of a murder victim, sought a declaration that the Governor lacked authority to commute the murderer's death sentence. The court upheld the dismissal of the suit for want of a justiciable controversy:

"It must be at once apparent that the plaintiffs have no standing to maintain this suit. The wrong of which they complain—if there be a wrong—is public in character. The complaint discloses no special injury affecting the plaintiffs differently from other citizens.

"\* \* \* No right, status, or legal relation of the plaintiffs is involved, and no legal interest of theirs will be affected by the action of the Governor. There is no case for declaratory relief where the 'plaintiff seeks merely to vindicate a public right to have the laws of the state properly enforced and administered.' The plaintiffs have a difference of opinion with the Governor, but that does not of itself make a justiciable controversy."

*Id.* at 124-25 (citation omitted).

Much like their federal court counterparts, the Oregon opinions on the issue of justiciability became rather muddled beginning in the 1960s. In one case, for example, the Oregon Supreme Court held that—contrary to prior case law—justiciability is *not* a jurisdictional matter and may be freely waived by the parties. *Dickman v. School Dist. 62 C,* 232 Or 238, 245, 366 P2d 533 (1962). But a few years later, in *Cummings Constr. v. School Dist. No. 9,* 242 Or 106, 408 P2d 80 (1965), the court reverted to prior case law—expressly invoking federal case law—and held that justiciability *is* required as a predicate to the constitutional exercise of judicial power.[7] *See also Gortmaker v. Seaton,* 252 Or 440, 442-43, 450 P2d 547 (1969) (constitutional exercise of judicial

---

[7] The court held:

"[C]ourts do not have jurisdiction to entertain a declaratory judgment action \* \* \* unless there is a 'justiciable controversy' between the parties. Neither can the parties confer jurisdiction upon the courts by stipulation in the absence of a justiciable controversy."

*Id.* at 109-10 (citation omitted).

Interestingly, notwithstanding the declaration in *Cummings Constr.* that justiciability cannot be conferred by stipulation, in *Lipscomb v. State Bd. of Higher Ed.,* 305 Or 472, 753 P2d 939 (1988), the court permitted the parties to do just that. The plaintiffs challenged the line-item veto authority of the Governor. They alleged as their interest in the outcome the fact that the Governor already unlawfully had vetoed provisions in bills that cost Oregon taxpayers over $85,000. The court noted that "[a]lthough the complaint did not allege the tax impact on these plaintiffs, and they are not entitled to rely on the cumulative cost to all 'taxpayers of the State of Oregon,' " it was not necessary to address the question of justiciability, because the "defendants have accepted the allegation as adequate." *Id.* at 476. Even more interesting, later that same year, in *Eckles v. State of Oregon,* 306 Or 380, 385, 760 P2d

power requires justiciable controversy). In another case, the Supreme Court—again, contrary to both prior and later case law—attempted to set the justiciability requirements in declaratory judgment actions on purely statutory grounds. *Eckles v. State of Oregon,* 306 Or 380, 383-84, 760 P2d 846 (1988). Indeed, in the same case, the court relied on decisions holding that the justiciability requirements exist as a matter of constitutional law. *Id.*

Further complicating matters, decisions during this period, while on the one hand attempting to place standing on purely statutory grounds, on the other hand still left open the possibility that the constitution places limits on the legislature's authority to grant standing. In *Marbet v. Portland Gen. Elect.,* 277 Or 447, 457 n 4, 561 P2d 154 (1977), for example, the court confronted the question whether a petitioner satisfied the standing requirements of the Administrative Procedures Act (APA), ORS 183.480, commenting in a footnote that "[i]t is not contended here that the standing conferred by ORS 183.480 exceeds 'the judicial power of the state.'"

Part of the problem appears to have been one of vocabulary, in particular, the use of the term "standing."[8] As the Supreme Court itself observed of its own cases, "[o]ur own treatment of the principle is not without ambiguity." *Oregon Medical Assn. v. Rawls,* 276 Or 1101, 1105-06, 557 P2d 664 (1977). Borrowing from federal cases, the court sometimes used the term "standing" to refer to the aspect of justiciability that requires a plaintiff or an appellant to have a concrete stake in the outcome of a proceeding. *See, e.g., Gortmaker,* 252 Or at 443; *Ore. Newspaper Pub. v. Peterson,* 244 Or 116, 120-21, 415 P2d 21 (1966). But in other cases, the court attempted to circumscribe the term more narrowly to refer

846 (1988), the Supreme Court characterized the holding of *Lipscomb* as establishing the sufficiency of an allegation of a plaintiff's "present or foreseeable financial interest," when *Lipscomb* said nothing of the sort.

[8] The use of the term "standing" as an aspect of justiciability actually is a fairly modern development. Originally, the term was used to refer to the extent to which a party had a claim on the merits. Thus, for example, the courts would determine whether a plaintiff could "maintain a stand in a court of equity." *City of Georgetown v. The Alexandria Canal Company,* 37 US (12 Pet) 91, 99 (1838). *See generally* Steven L. Winter, *The Metaphor of Standing and the Problem of Self-Governance,* 40 Stan L Rev 1371, 1418-52 (1988) (describing the history of the use of the term).

solely to the legislative determination of who may seek review of specific governmental actions. *See, e.g., Strawberry Hill 4 Wheelers v. Benton Co. Bd. of Comm.,* 287 Or 591, 609 n 8, 601 P2d 769 (1979).

The problem haunts Oregon appellate court decisions to this day. More recent decisions sometimes employ the broader, more traditional use of the term as generally referring to "the right to obtain an adjudication." *See, e.g., Eckles,* 306 Or at 383; *Poddar v. Clatsop County,* 167 Or App 162, 168, 2 P3d 929, *on recons* 168 Or App 556, 7 P3d 677, *rev den* 331 Or 193 (2000). Others employ the term in the narrower sense of the legislatively imposed limitations on access to judicial remedy. *See, e.g., Local No. 290 v. Dept. of Environ. Quality,* 323 Or 559, 564, 919 P2d 1168 (1996); *Associated Builders and Contractors v. Tri-Met,* 170 Or App 271, 275-76, 12 P3d 62 (2000).

By the beginning of the last decade, however, the Oregon courts settled on a justiciability analysis that—regardless of inconsistencies in terminology—in substance has been applied consistently ever since. In *People for Ethical Treatment v. Inst. Animal Care,* 312 Or 95, 817 P2d 1299 (1991), the court determined that an association lacked standing to challenge a University of Oregon order approving research on the auditory system of barn owls. The court began by noting that

> "*aside from certain constitutional considerations not presented by this case,* a reviewing court's inquiry into the standing of an entity seeking judicial review is confined to an interpretation of legislative intent."

*Id.* at 99 (emphasis added). The court then held that the association failed to satisfy the statutory standing requirements of the APA, ORS 183.480, because it could not demonstrate "a personal stake in the outcome." *Id.* at 100-03. Because the court concluded that the association had failed to satisfy the statutory standing requirements of the APA, it did not need to address any "constitutional considerations." The decision thus signaled a return to the court's earlier practical effects jurisprudence. Indeed, in every subsequent case, the court has held explicitly that justiciability includes the requirement that "the court's decision in the matter will have some

practical effect on the rights of the parties." *Brumnett v. PSRB,* 315 Or 402, 848 P2d 1194 (1993); *see also Hamel v. Johnson,* 330 Or 180, 184, 998 P2d 661, *on remand* 169 Or App 216, 9 P3d 719 (2000), *on recons* 173 Or App 448, 25 P3d 314 (2001) ("A court's decision on a matter must have some practical effect on the rights of the parties to the controversy."); *McIntire v. Forbes,* 322 Or 426, 433, 909 P2d 846 (1996) (a justiciable controversy exists when the court's decision in the matter will have some practical effects on the rights of the parties to the controversy); *Barcik v. Kubiaczyk,* 321 Or 174, 182, 895 P2d 765 (1995) (same); *Joint Council of Teamsters #37 v. BOLI,* 168 Or App 398, 407, 11 P3d 247, *rev den* 331 Or 429 (2000) (justiciability involves two-part inquiry: whether the parties are adverse and "whether the court's decision will have a practical effect on the rights of the parties"); *Baty v. Slater,* 161 Or App 653, 656, 984 P2d 342 (1999), *on recons* 164 Or App 779, 984 P2d 342, *rev den* 331 Or 191 (2000) (a justiciable controversy exists when "the court's decision in the matter will have some practical effect on the rights of the parties"); *Barnes v. Thompson,* 159 Or App 383, 386, 977 P2d 431, *rev den* 329 Or 447 (1999) (same); *State v. Lavitsky,* 158 Or App 660, 663, 976 P2d 82 (1999) (same).

The courts have held that this aspect of justiciability is so important that it must remain satisfied throughout the litigation, not just at the time of filing. Thus, if a claim is justiciable at the time of filing, but events transpire that later would deprive a court decision of a practical effect on the plaintiff or petitioner, the claim is no longer considered justiciable. It is "moot." As the Supreme Court explained in *Brumnett*:

> "Determining mootness is one part of the broader question of whether a justiciable controversy exists. A justiciable controversy must exist, for appellate courts may not 'decide abstract, hypothetical or contingent questions.'
>
> "A preliminary question related to whether a justiciable controversy exists is whether the interests of the parties to the action are adverse. * * *
>
> "A second requirement for a justiciable controversy is that the court's decision * * * will have some practical effect on the rights of the parties to the controversy.

"Cases that are otherwise justiciable, but in which a court's decision no longer will have a practical effect on or concerning the rights of the parties, will be dismissed as moot."

*Brumnett,* 315 Or at 405-06 (citations omitted). To say that a case is "moot," in other words, is simply to say that a case that may once have been justiciable is no longer; conversely, to say that a case is *not* moot is simply to say that the court's decision *will* have a practical effect on the rights of the parties. By definition, the mootness doctrine reaffirms the basic principle of justiciability that, *at all times,* the court's decision must have a practical effect on the rights of the parties. *See also Hamel,* 330 Or at 184 ("Even if a case otherwise is justiciable, if the court's decision 'no longer will have a practical effect on or concerning the rights of the parties,' then the matter will be dismissed as moot.") (citation omitted); *Barcik,* 321 Or at 182 (" 'Cases that are otherwise justiciable, but in which a court's decision no longer will have a practical effect on or concerning the rights of the parties,' are moot.") (citation omitted); *State v. Macy,* 320 Or 408, 412, 886 P2d 1010 (1994) (same); *Lavitsky,* 158 Or App at 663 (same); *Jones v. Thompson,* 156 Or App 226, 236, 968 P2d 380 (1998), *rev den* 330 Or 363 (2000) (same); *Responsible Public Contracting Council, Inc. v. DAS,* 153 Or App 96, 100, 956 P2d 993 (1998) (same).[9]

Two subsidiary questions emerge from the courts' articulation of what justiciability requires: (1) What precisely does it mean to say that a decision must have "a practical effect" on the rights of the parties? And (2) to whom does the practical effects requirement apply?

We begin with the scope of the practical effects requirement. No prior decision defines its outer boundaries. Instead, the courts have contented themselves with offering examples of what suffices. *See, e.g., Eckles,* 306 Or at 385 (noting that, in prior cases, the court had held that justiciable

---

[9] As Professor Henry P. Monaghan put it, mootness is "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." Henry P. Monaghan, *Constitutional Adjudication: The Who and When,* 82 Yale LJ 1363, 1384 (1973).

interests included a present or foreseeable financial impact, an interference with the rights of voters, and an adverse impact on the users of a road). More often, the courts have defined a "practical effect on the rights of the parties" by what is *not* sufficient. *See, e.g., Gruber v. Lincoln Hospital District,* 285 Or 3, 8, 588 P2d 1281 (1979) (a taxpayer who alleged only an interest in the proper expenditure of public funds did not have standing to challenge the lawfulness of the expenditure).

Perhaps the one category of cases that the courts have most consistently held does not present a justiciable controversy is the simple assertion that another individual or government agency has violated the law. Without some demonstration that the challenged agency action will have a practical impact on the person challenging it, such a case amounts to no more than a request for an unconstitutional advisory opinion. The principle dates back at least to *Oregon Cry. Mfgs. Ass'n,* in which the Supreme Court held that "a mere difference of opinion concerning the validity of a statute" is insufficient to warrant a constitutional invocation of the judicial power. 159 Or at 99. Similarly, in *Eacret,* the court held that "[t]here is no case for declaratory relief where the 'plaintiff seeks merely to vindicate a public right to have the laws of the state properly enforced and administered.' " 215 Or at 125 (citation omitted); *see also Amer. F. of L. v. Bain,* 165 Or 183, 215, 106 P2d 544 (1940) ("Mere difference of opinion as to the constitutionality of an act does not afford ground for invoking a judicial declaration having the effect of an adjudication.").

Of more recent vintage is our decision in *Poddar,* in which the plaintiff alleged that the Board of County Commissioners for Clatsop County violated the law when it appointed individuals to various boards and service districts. 167 Or App 162. We held that the plaintiff's claims were not justiciable, because "[h]e has demonstrated only an abstract interest in the correct application of the county's policies that he shares with every other member" of the public. *Id.* at 170. Similarly, in *Erwin v. Oregon State Bar,* 149 Or App 99, 941 P2d 1094 (1997), a lawyer sought to challenge the lawfulness of various state bar rules and practices. We upheld the dismissal of most of his claims on the ground that he had failed to demonstrate that the challenged rules or practices applied

to him: "In each case, plaintiff failed to allege more than an abstract interest in the validity of the challenged laws." *Id.* at 107. *See also deParrie v. State of Oregon,* 133 Or App 613, 617, 893 P2d 541 (1995) (the plaintiff's claim held not justiciable because "he [did] not demonstrate any 'injury or other impact on a legally recognized interest beyond an abstract interest in the correct application or the validity of a law' " (quoting *Budget Rent-A-Car v. Multnomah Co.,* 287 Or 93, 95, 597 P2d 1232 (1979))).

That leaves the question of to whom the practical effects requirement applies. On that question, the courts have been more categorical: To have standing, *the person invoking the jurisdiction of the courts* must establish that a decision would have a practical effect on him or her. As the Supreme Court declared in *Gortmaker:* "In order to have standing to maintain declaratory proceedings, one must allege a substantial interest in the matter in controversy." *Gortmaker,* 252 Or at 443. It is not sufficient that the person *against whom* a proceeding is initiated might be affected by a judicial decision. Thus, for example, in *Eacret,* in which the parents of a murder victim challenged the authority of the Governor to commute a murderer's sentence, a judicial decision clearly would have affected the authority of the Governor. The case nevertheless was dismissed because the parents could not satisfy the constitutional practical effects requirement. *Eacret,* 215 Or at 125. Similarly, in *Poddar,* a decision on the merits as to the authority of the county to make the challenged appointments certainly would have had a practical effect on the county. We nevertheless dismissed the case, because the plaintiff could not demonstrate that such a decision would practically affect him in any way. *Poddar,* 167 Or App at 170. Likewise, in *Erwin,* a decision on the merits concerning the validity of various rules of the Oregon State Bar clearly would have affected the Bar, yet we dismissed the plaintiff's claims because he could not establish that such a decision would affect him. *Erwin,* 149 Or App at 107.

Thus far, we have described the origins and nature of the requirement that, for an individual to invoke the judicial power conferred under Article VII, there must be a justiciable controversy. There remains the question whether the legislature can abrogate or modify what the constitution

requires. In that regard, we note that the Oregon courts apparently have chosen not to follow the federal courts in creating a two-tiered approach to justiciability, *i.e.,* first, a constitutional threshold and second, a series of judicially created prudential considerations that the legislature may freely modify. Instead, the Oregon courts have described justiciability solely in constitutional terms. *See, e.g., First Commerce of America v. Nimbus Center Assoc.,* 329 Or 199, 206, 986 P2d 556 (1999) ("under Article III, section 1, and Article VII (Amended), section 1, of the Oregon Constitution, the judicial power of the state vested in courts [is] limited to actual controversies between parties") (citing *Barcik,* 321 Or at 188-89). That has significant implications, for, if indeed the justiciability conditions that the courts have imposed are constitutionally required for the exercise of the judicial power, it necessarily follows that the legislature cannot detract from those minimum requirements. In other words, if the "practical effects" requirement is truly a prerequisite to the constitutional exercise of the judicial power, the legislature cannot abrogate that requirement by statutory fiat.

That reasoning certainly comports with the historical concerns reflected in such early pronouncements as *Hayburn's Case,* in which the justices held that the legislative branch is simply without constitutional authority to require the judicial branch to act outside the scope of authority conferred by the grant of "judicial power" in the constitution. That also is the position that the federal courts have taken, in holding that the constitutional components of justiciability amount to an "immutable" and "irreducible minimum." *E.g., Lujan,* 504 US at 560-61.

Likewise, it is the course followed by the Oregon courts. The lead opinion in that regard is *In re Ballot Title,* 247 Or 488, 431 P2d 1 (1967). In that case, the legislature enacted a statute that required the Supreme Court to review *all* ballot titles prepared by the Attorney General, even those unchallenged by any voter. The court held that the statute amounted to an unconstitutional attempt to confer on the courts authority that exceeded the "judicial power." Invoking the intentions of the framers of the federal constitution—in particular, those explained in *Hayburn's Case* and the Correspondence of the Justices—the court explained:

"The first doctrine to evolve in this nation's constitutional jurisprudence was that courts are limited to the exercise of the judicial function and should not and cannot render advisory opinions. When first required by Congress to act in a nonjudicial capacity, Chief Justice John Jay responded:

"'* * * [U]nder the Constitution, the Government was divided into three "distinct and independent branches, and that it is the duty of each to abstain from and to oppose encroachment on either, that neither the Legislative nor the Executive branch can constitutionally assign to the Judicial any duties but such as are properly judicial, and to be performed in a judicial manner"; * * *.' 1 Warren, The Supreme Court in United States History, p 70, referring in part to *Hayburn's Case,* 2 US 408 (1792).

"A like request by President Washington received the same answer. Haines, The Role of the Supreme Court in American Government and Politics, 1789-1835, 1944, pp 143-148. The doctrine became equally well-imbedded [*sic*] in the jurisprudence of the state courts."

*In re Ballot Title,* 247 Or at 492. The court noted that, because the giving of advisory opinions is not a judicial function, any attempt legislatively to empower the courts to do so violates constitutional principles of the separation of powers. *Id.* at 494-95.

*Oregon Medical Association v. Rawls,* 281 Or 293, 574 P2d 1103 (1978), similarly holds that the legislature is without authority to alter the requirements of justiciability. In that case, the legislature enacted a statute providing a plan under which participating physicians could secure themselves against personal liability for professional negligence. Or Laws 1977, ch 269. The legislature further provided for "judicial examination and judgment" of the constitutionality of the enactment. *Id.* at § 11. The legislature declared that the state Insurance Commissioner, the Oregon Medical Association, and any other interested person could petition the Supreme Court for immediate review of the constitutionality of the statute. *Id.* Pursuant to that law, the Insurance Commissioner and the Oregon Medical Association petitioned the Supreme Court for review of the statute,

both of them asserting that the statute was entirely constitutional. On its own motion, the Supreme Court dismissed the petition on the ground that it failed to present a justiciable controversy. According to the court, a matter may not be " 'deemed' a 'justiciable controversy' within the judicial power vested by [A]rticle VII ([A]mended)." *Rawls,* 281 Or at 300. Specifically, the court noted, the first of the two essential requirements of justiciability—adversity—was not present, and the requirement could not simply be waived by legislative fiat. *Id.* at 297-300.

To be sure, the precise holding of the case was that the legislature cannot waive the requirement of adversity, the first of the two components of justiciability. By parity of reasoning, however, the same rule must apply to the requirement of practical effects, the second of the two components, as well.

■ That the legislature cannot constitutionally confer authority on the courts to render opinions in the absence of a practical effect is borne out by the declaratory judgment cases that we have described above. In each case, the courts have held that the practical effects component must be satisfied regardless of the terms of the statute under which a plaintiff brings a claim. Thus, for example, in *Cummings Constr.,* the Supreme Court noted that the declaratory judgment statute created a broad remedy by which individuals may obtain a judicial pronouncement on the validity or construction of an enactment. It then held:

> "*Despite this statute,* courts do not have jurisdiction to entertain a declaratory judgment action requesting the interpretation of a statute or a declaration of one's rights thereunder unless there is a 'justiciable controversy' between the parties."

*Cummings Constr.,* 242 Or at 109 (emphasis added) (quoting *Oregon Cry. Mfgs. Ass'n,* 159 Or at 111).

■ It bears emphasis that the declaratory judgment cases hold that the justiciability requirement exists *as a matter of constitutional principle* independent of what conditions the declaratory judgment act does or does not impose. As the Supreme Court noted in *Barcik:* "This court has applied the

justiciability requirement to declaratory judgment actions for over fifty years and has noted the constitutional origins of that requirement." 321 Or at 188 (citing *Oregon Cry. Mfgs. Ass'n,* 159 Or at 109); *see also Brown v. Oregon State Bar,* 293 Or 446, 449, 648 P2d 1289 (1982) ("The court cannot exercise jurisdiction over a nonjusticiable controversy because in the absence of constitutional authority, the court cannot render advisory opinions."). Thus, the fact that the cases arose under the declaratory judgment statute affords no basis for distinguishing them. Indeed, the court has expressly held that the rules of justiciability do not vary merely because a case arises under the declaratory judgment statute. *See, e.g., Barcik,* 321 Or at 188.

The independent constitutional basis of the practical effects requirement is further confirmed by the Supreme Court's decision in *McIntire.* In that case, the legislature enacted a statute that, among other things, partially funded a light-rail project, expanded the availability of card-lock service stations, regulated confined animal feeding, preempted local pesticide regulation, and adopted new timber harvesting rules. In the same statute, the legislature provided that any "interested person" may petition the Supreme Court for a determination of the constitutionality of such a wide-ranging enactment. Or Laws 1995, ch 3, § 18 (Spec Sess). The petitioners, two taxpayers, sought just such a determination, naming as the respondent the Director of the Department of Transportation. The Tri-County Metropolitan Transportation District of Oregon (Tri-Met), the regional entity responsible for the light-rail project, intervened and challenged the petition on grounds of statutory and constitutional standing. The court responded to the challenge by analyzing each issue separately.

The court began with the question whether the petitioners satisfied the statutory requirement that petitioners be "interested persons." The court held that the petitioners were "interested" within the meaning of the statute, because upholding the statute would mean that the petitioners would have to pay property taxes to retire the general obligation bonds that Tri-Met would have to issue to pay for the light-rail project and because state funds would have to be diverted

to help pay for the project, funds that would have gone to cities and counties in which the petitioners resided. *McIntire,* 322 Or at 433-34.

Next, and separately, the court addressed whether—even though they satisfied the standing requirements of the statute—the petitioners also satisfied the justiciability requirements of the constitution. Citing *Brumnett,* the court began by noting the familiar two-part test of justiciability: that the parties be adverse and that a decision would have a practical effect. *McIntire,* 322 Or at 433-34. The court quickly observed that the interests of the parties obviously were adverse. As for a practical effect of a decision on the merits, the court held that the facts that established that the parties were "interested" within the meaning of the statute also established a sufficient practical effect to satisfy the constitutional standard. *Id.* The court did not say that the petitioners' claims were justiciable merely because they had statutory standing. To the contrary—consistent with its declaratory judgment decisions over the past six decades— the court independently examined the facts that established statutory standing to determine whether those facts also would be sufficient to establish the practical effects necessary to satisfy the constitution. *Id.*

In short, regardless of what the legislature provides regarding the standing of litigants to obtain judicial relief, the courts *always* must determine that the constitutional requirements of justiciability are satisfied. Any legislation conferring the authority to render an opinion in the absence of a practical effect on the party seeking relief, by definition, amounts to a conferral of authority to render an advisory opinion. And, as consistently manifested in a line of decisions tracing back over two centuries, such a conferral violates basic constitutional principles of the separation of powers.

With those principles in mind, we turn to the question whether the League presents a justiciable controversy in this case. As we noted at the outset of this opinion, the League submitted a letter to the county in opposition to the Lillies' application. The letter did not identify what the League is, nor did it provide any explanation of the League's interest in the application. It simply stated that the League

opposed the application on the ground that approval would be unlawful. When the Lillies appealed to LUBA, the League moved to intervene. Once again, the League did not explain what it is or the nature of its interest in the application or how it would be affected by a decision on it one way or the other. The motion merely stated the fact of the League's appearance before the county. On appeal, the League provides no additional information concerning its composition, its interest in the application, or any practical effect that a decision would have on its rights. It simply cites ORS 197.850(1) and ORS 197.830(2) and (7) and contends that the legislature's conferral of statutory standing on any person without regard to any practical interest in the outcome suffices to create a justiciable controversy.

ORS 197.850(1) provides that "[a]ny party to a proceeding before the Land Use Board of Appeals * * * may seek judicial review of a final order issued in those proceedings." ORS 197.830(2) provides that any person who "[a]ppeared before the local government * * * orally or in writing" may petition LUBA for review of a land use decision. ORS 197.830(7) provides that any person who has made such an appearance may intervene in such a review proceeding. Thus, as the League suggests, the statutes confer a right to seek judicial review of a land use decision without having to establish any particular interest in the decision itself. As long as a person has appeared before the local government, that person has the right to intervene in a LUBA review proceeding and the further right to seek review in court of LUBA's decision. In this case, there is no question that the League appeared before the local government. The sole question is whether having satisfied that statutory requirement makes this case justiciable.

In light of the principles of justiciability that we have described, we cannot but conclude that the satisfaction of the statutory requirement alone is insufficient to establish the justiciability of the League's petition.

To begin with, as we have observed, because the League is the sole party that has invoked the jurisdiction of this court, it is the League's obligation to establish the justiciability of its claim. *Gortmaker,* 252 Or at 443. Moreover, to

establish such justiciability, the League must demonstrate that a decision in this case will have a practical effect on its rights. *Barcik,* 321 Or at 182; *Brumnett,* 315 Or at 405-06. The League must do so regardless of what the statutes provide by way of conditions—or lack of conditions—on obtaining judicial review. The case law concerning the "practical effects" requirement clearly states that an abstract interest in the proper application of the law is not sufficient. *Eacret,* 215 Or at 125; *Oregon Cry. Mfgs. Ass'n,* 159 Or at 109; *Poddar,* 167 Or App at 170. In this case, the League's only contention is that its disagreement with LUBA concerning the lawfulness of the approval of the Lillies' application is sufficient. That is at odds with settled principles of justiciability.

The League insists that, by conferring on it the right to seek judicial review of LUBA's decision, the legislature, in effect, has conferred on it a statutory right to vindicate the proper application of the state's land use laws. In other words, the League argues, a decision in this case will have a practical effect on its rights because the legislature has conferred on it the right to request such a decision.

■ ■ The argument is entirely circular. The legislature surely has the authority to confer rights. But it does not follow that the conferral of statutory rights necessarily creates a justiciable controversy. As the *Ballot Title* and *Rawls* decisions make clear, the legislature does not have the constitutional authority to confer the right to seek from the courts a decision in a nonjusticiable case. Conferring such a right would grant the courts authority not included in the "judicial power" conferred under Article VII (Amended) and thus run afoul of separation of powers principles.

In this case, the only right conferred by ORS 197.830 and ORS 197.850 is the right to seek judicial review of a local government decision without having to establish that the decision will affect the person seeking the review. That is nothing more than the conferral of the right to obtain an advisory opinion, which is beyond the authority of the legislature to grant. Thus, the right conferred by those statutes cannot constitutionally suffice to establish the justiciability of the League's petition. The League relies on no other

ground for its contention that its petition is justiciable. We must therefore conclude that the petition is nonjusticiable.

We turn, then, to the several dissenting opinions. Chief Judge Deits contends that the constitution simply does not impose a practical effects requirement. Judge Armstrong similarly contends that the practical effects requirement mentioned in the case law refers only to mootness, not to a constitutional standing requirement, and that no constitutional limitation constrains the legislature in conferring on litigants the right to seek judicial review of government action. Finally, Judge Brewer attempts to stake out a middle position, namely that, although the constitution imposes a practical effects requirement, the requirement is satisfied when the legislature confers standing on members of the public to challenge administrative agency actions. Each dissent takes a slightly different approach and warrants addressing separately. But before doing that, it is perhaps instructive to observe that there is a common strategy employed by all of them. All begin by *assuming* the validity of the case law during the 1970s and 1980s—cases in which the courts attempted to articulate a distinctly different approach to justiciability, an approach, as we have endeavored to make clear, that cannot be reconciled with either earlier or subsequent decisions. They then work backwards from there, either by attempting to distinguish contrary cases on their facts or by declaring the contrary earlier and subsequent cases simply to be incorrect. None attempts to examine the case law as a whole, without *a priori* assumptions, in historical perspective, as required under *Priest*.

We begin with Chief Judge Deits's dissent. Judge Deits begins by complaining that we apparently "believe[ ] that [our] conclusion is driven by federal, as well as Oregon, case law." 176 Or App at 563. That is simply wrong. The result in this case is in no way driven by federal law. It is driven by a well-developed body of state constitutional jurisprudence. In describing the development of that body of state law, however, we have attempted to show that it has some roots—both in terms of history and vocabulary—in federal case law. In so doing, we have simply followed Oregon Supreme Court practice, which frequently resorts to an analysis of federal case law as the context within which

Oregon constitutional interpretation has taken place. *See, e.g., State v. Fugate,* 332 Or 195, 210-15, 26 P3d 802 (2001) (describing federal *ex post facto* case law as historical context for proper understanding of Oregon *ex post facto* clause). In fact, that is precisely the approach the Supreme Court previously has taken in articulating the justiciability requirements of Article VII (Amended) of the Oregon Constitution. *See, e.g., In re Ballot Title,* 247 Or at 492 (describing development of federal justiciability doctrine as context for Oregon justiciability analysis).

Judge Deits then moves to the heart of her thesis, that is, that the constitution simply does not require that the party seeking to invoke the judicial power must establish that a judicial decision will have a practical effect on his or her rights. According to Judge Deits, the imposition of an effects requirement is purely a matter of statute. In support of that thesis, Judge Deits places primary reliance on *Eckles.* She acknowledges that there is language in the case law to the contrary, in particular, in *People for Ethical Treatment* and *Marbet.* 176 Or App at 566 n 2. She simply concludes that such language is wrong. Instead, she suggests, we should understand any prior decisions concerning a practical effects requirement as pertaining solely to mootness. 176 Or App at 564.[10]

---

[10] Judge Deits has a particularly difficult time distinguishing *McIntire.* She suggests that the decision "is admittedly somewhat confusing." 176 Or App at 569. She insists, however, that the court's discussion of the practical effects really "is about mootness and only about mootness." *Id.* To begin with, as we have explained, there is no way to demonstrate that a case is not moot without demonstrating that a decision will have a practical effect on the party invoking the authority of the court. Thus, to say that *McIntire* "is about mootness" is simply to disagree about labels.

But, even assuming the apparently narrower understanding of mootness that Judge Deits employs, her reading of *McIntire* does not withstand scrutiny. The plaintiffs in *McIntire* had brought their challenge *before* the federal government had committed funds on which the operation of the challenged statute was made contingent. There certainly was a potential ripeness problem, and the court separately addressed it as such. But—not surprisingly—no one suggested that there was a mootness problem. Indeed, a review of the briefs in that case makes clear that the parties had addressed the practical effects issue in the context of a contention that the plaintiffs lacked constitutional standing, and the court addressed those arguments in exactly those terms. *McIntire,* in other words, means exactly what it says.

With respect, Judge Deits's dissent reflects a misapprehension of the relationship between justiciability and mootness. As we have noted, the Supreme Court repeatedly has instructed that justiciability requires that a party invoking the judicial power must be able to establish that a decision will have a practical effect on his or her rights. Mootness merely refers to the temporal aspect of that essential requirement of justiciability. It refers to the requirement that the person invoking the courts' authority be able to establish that practical effect *at all times* during the course of the litigation. If at any time the party invoking the authority of the courts cannot make that showing, the case has become moot. Thus, by definition, the mootness requirement reaffirms the basic requirement of justiciability that the party invoking the courts' authority must be able to establish the requisite practical effect. Indeed, it is impossible to establish that a case is not moot without showing that it will have a practical effect on the rights of the parties. *Brumnett,* 315 Or at 405-06.

Judge Deits further asserts that in none of the decisions that we have canvassed has this court or the Supreme Court dismissed the case because of a failure to satisfy the practical effects requirement. 176 Or App at 568. That, too, is incorrect. As we have noted, *Eacret, Bain, Poddar, Erwin,* and *deParrie*—among others—are squarely to the contrary. In each, the courts dismissed not because of mootness or ripeness or adversity problems, but because the plaintiffs' abstract disagreement with a challenged decision was held insufficient to satisfy the constitutional practical effects requirement.

Judge Deits suggests that the parties' abstract disagreement was insufficient in those cases because the legislature had not *statutorily* conferred the right to seek the relief that they requested. Once again, that is incorrect. In each of those cases, the plaintiffs sought judicial relief conferred by the Declaratory Judgment Act. Notwithstanding the conferral of that statutory right to seek relief, the courts have repeatedly confirmed that the *constitution* requires satisfaction of a practical effects requirement. *See, e.g., Barcik,* 321 Or at 188 (noting the constitutional origins of practical effects test in declaratory judgment cases); *Cummings Constr.,* 242

Or at 109 (requiring satisfaction of justiciability require-
ments in declaratory judgment cases "despite this statute").

Finally, in a footnote, Judge Deits complains that
our opinion "may also implicate separation of powers consid-
erations." 176 Or App at 565 n 1. According to Judge Deits,
the power to define the rights that parties may seek to protect
through the judicial process properly is part of the legislative
power. Let there be no misunderstanding. Our opinion does
not merely implicate separation of powers considerations. It
is directly driven by separation of powers concerns. As we
have been at pains to demonstrate, it is separation of powers
considerations that have provided the principal underpin-
ning for the creation of justiciability doctrine generally and
the practical effects requirement particularly. Although it
certainly is the legislature's constitutional prerogative to cre-
ate rights, the creation of those rights cannot call upon the
judiciary to exercise power that has not been conferred by
Article VII (Amended) of the constitution. That is precisely
what would happen under Judge Deits's conception of
justiciability.

Judge Armstrong strikes a similar note in contend-
ing that, although the constitution may impose certain justi-
ciability requirements, in no case has any court "suggested
that there are constitutional limits on the choices to be made
by the legislature and the courts concerning the *content* of
those requirements." 176 Or App at 576 (emphasis in origi-
nal). Invoking separation of powers concerns, he contends
that:

"Nothing about the nature of the judicial power suggests to
me that the Oregon Constitution prevents the courts or the
legislature from implicitly recognizing interests * * * by
giving people a broad right to challenge governmental
actions, so long as doing so does not substantially impair
the ability of courts to adjudicate cases."

176 Or App at 578. In a footnote, he elaborates:

"The qualifying language in that statement recognizes
that the separation-of-powers principle embodied in the
Oregon Constitution prevents one branch of government
from taking actions that substantially impair the ability of

another branch to perform the functions that the constitution has assigned to it. Nothing suggests that the grant of standing at issue in this case could conceivably impair the ability of courts to perform their adjudicatory role."

176 Or App at 578 n 8 (citation omitted).

Judge Armstrong's analysis is predicated on a misapprehension of Oregon separation of powers analysis. Article III, section 1, of the Oregon Constitution, certainly does prohibit the legislature from enacting legislation that would have the effect of impairing the judiciary from carrying out its constitutional functions. But that is not all that it prohibits. It also prohibits one branch of government from exercising the functions committed to another branch. *See generally* Roy Pulvers, *Separation of Powers Under the Oregon Constitution: A User's Guide,* 75 Or L Rev 443, 448 (1996). More to the point: It prohibits the legislature from conferring on the judiciary the power to perform a nonjudicial function. *See In re Ballot Title,* 247 Or at 491-92, 495 (declaring statute unconstitutional because it "seeks to have the court perform a nonjudicial function, contrary to the prohibition of Art III, § 1"); *see also Rooney v. Kulongoski (Elections Division # 13),* 322 Or 15, 25-26, 902 P2d 1143 (1995) (Article III, section 1, prohibits legislature from assigning to judiciary nonjudicial functions). That is the constitutional infirmity of a statute that purports to grant to the courts the power to entertain a petition for judicial review by a petitioner who would be unaffected by a judicial decision. It is, in effect, an advisory opinion, unconstitutional under Article III, section 1. Thus, contrary to Judge Armstrong's suggestion, there are indeed constitutional limits to what the legislature can do in the way of authorizing a petitioner to invoke the judicial power.

Judge Armstrong rejoins that, in fact, permitting any litigant to seek judicial review of government action would not require the courts to issue advisory opinions. He arrives at that conclusion by simply redefining what amounts to an advisory opinion. According to Judge Armstrong, the constitution requires only that there be a dispute between contestants and that the court can grant "relief" regarding the dispute. By "relief," Judge Armstrong apparently refers to the ability of the court to answer the

legal question posed by the parties. He suggests that nothing in the constitution would preclude the legislature or the courts from permitting any person from challenging any government action, regardless of whether that person would be affected by it.[11]

Judge Armstrong thus presumes that there simply is no practical effects requirement in the first place. That much assumed, he finds it easy to declare unobjectionable legislation that confers standing on anyone in virtually any case without regard to practical effects. The problem is that his premise is without foundation. There is, indeed, a practical effects requirement, as we have attempted to demonstrate in some detail. Because there is such a constitutional requirement, it necessarily follows that the legislature cannot constitutionally eliminate it.

Judge Armstrong in fact appears to concede that much. While on the one hand asserting that the legislature may "adjust the content" of the elements of justiciability, on the other hand, he acknowledges that there are limits:

> "I do not mean to imply that the freedom to adjust the content of those elements is truly limitless. *An adjustment to an element that has the effect of eliminating it is not permitted.*"

176 Or App at 576 n 3 (emphasis added). That is precisely the problem in this case. The statute on which the League relies *completely* eliminates any requirement that a party seeking judicial relief must establish that such relief will have a practical effect on his or her rights.

We turn to Judge Brewer's dissent. Unlike Judges Deits and Armstrong, Judge Brewer agrees that, to invoke the judicial power, litigants must establish that a decision will have a practical effect on their rights. He nevertheless insists that, in this case, the League has demonstrated the required practical effect. He reaches that conclusion by

---

[11] It is perhaps worth pointing out that, in making the point, Judge Armstrong resorts to examples and references to academic commentary that reflect the public rights model of adjudication that was first proposed in the 1970s. Judge Armstrong does not explain, and we do not understand, how it is that the framers of the Oregon Constitution intended to adopt a theory of justiciability that had not been articulated until more than a century after ratification.

declaring that cases involving challenges to the lawfulness of administrative agency actions are different. According to Judge Brewer, where the legislature has conferred on a member of the public the right to challenge administrative agency action, the practical effects requirement has been satisfied by legislative act. In making that argument, he cautions that "[i]t is essential to remember that this case is not a private dispute between private parties." 176 Or App at 586. To Judge Brewer, the fact that this case involves a challenge to an action of an administrative agency is the key to the proper disposition of the question of the justiciability of this case.

Why the legislature may simply declare that a justiciability requirement has been satisfied in some cases, but not in others, Judge Brewer never explains. He does emphasize that the legislative conferral of standing in this case is part of a comprehensive statutory program of land use enforcement. But that does not explain the source of the legislature's authority to eliminate a requirement of justiciability that he concedes otherwise is required. Indeed, if anything, in cases in which the courts are called upon to invalidate an action of an agency of another branch, separation of powers concerns would counsel a heightened sensitivity to the requirements of justiciability, not a relaxation of those requirements. As the Supreme Court cautioned in *Oregon Cry. Mfgs. Ass'n* after describing the importance of courts not issuing opinions in the absence of a concrete controversy, "[p]articularly should this be so when a court is asked to declare that a co-ordinate branch of the government has exceeded its power." *Oregon Creamery,* 159 Or at 109.

Judge Brewer also emphasizes the importance of permitting the legislature to ensure that agency actions of significant "public interest" or "public concern" be subject to judicial review. The Oregon courts, however, consistently have ruled that the rules of justiciability do not vary with the public importance of the issues involved. *See, e.g., Barcik,* 321 Or at 188-89 (rejecting "public importance" exception to mootness doctrine); *Rawls,* 281 Or at 301 (rule against issuing advisory opinions is not subject to a "great public importance" exception).

Judge Brewer claims support for his distinction between private disputes and judicial review of agency actions in the Supreme Court's decision in *Marbet.* According to Judge Brewer, in that case, the court held that standing "depended on the intervenor's representation of the public interest in a matter of public concern, not on the intervenor's personal stake in the decision." 176 Or App at 587. Judge Brewer reasons that, because that case involved judicial review of agency action, the court must have at least implicitly held that the rules of justiciability are different in such cases.

The problem with that reading of the decision is that it ignores the fact that the court did not address standing as a constitutional issue. It addressed the extent to which the intervenors satisfied the standing requirements that applied under the APA. Indeed, the court expressly *disclaimed* any opinion on the question whether "the standing conferred by ORS 183.480 exceeds 'the judicial power of the state' " conferred by Article VII (Amended). *Marbet,* 277 Or at 457 n 4. If, as Judge Brewer suggests, the legislative conferral of standing was sufficient, there was no constitutional issue for the court to reserve for another day, and its disclaimer makes no sense. To the contrary, as we noted in our discussion of *People for Ethical Treatment,* the court has not determined that a legislative conferral of standing, by itself, suffices. In that case—an administrative agency action case—the court declared that,

> "*aside from certain constitutional considerations* not presented by this case, a reviewing court's inquiry into the standing of an entity seeking judicial review is confined to an interpretation of legislative intent."

312 Or at 99. Plainly, the legislative conferral of standing is not, by itself, sufficient, even in administrative agency action disputes.

Somewhat surprisingly, Judge Brewer claims that *People for Ethical Treatment* supports his view of justiciability. He acknowledges that the court held that the petitioner in that case lacked standing because it failed to satisfy the standing requirements of the APA, not the constitution. He nevertheless insists that the court's construction has some

constitutional significance, because if it did not, the court should have *sua sponte* dismissed for lack of standing on constitutional grounds. 176 Or App at 592 n 6.

We respectfully disagree. In addressing the statutory question first, the court merely followed the familiar "first things first" methodology that always requires consideration of nonconstitutional arguments before constitutional ones. *See, e.g., State v. Moylett,* 313 Or 540, 545, 836 P2d 1329 (1992) ("All issues should first be addressed on a subconstitutional level."). By resolving the case at the statutory level, the court in *People for Ethical Treatment* appropriately avoided even addressing the issue of whether the association could have satisfied the constitutional requirements of justiciability. The decision provides no support for the suggestion that, while the constitutional practical effects requirement applies in all other cases, it does not in cases involving administrative agency actions.

Going on the offensive, Judge Brewer contends that there is no language in either Article III or Article VII (Amended) that imposes a limit on the legislature's authority to confer standing on anyone it pleases. 176 Or App at 588.[12] Strictly speaking, that is correct. As we observed early in this opinion, there is nothing in the Oregon Constitution that speaks directly to the subject of justiciability, much less to ripeness, mootness, standing, or adversity. Yet from the reference in the constitution to the authority of the courts to exercise only the "judicial power," the courts have created doctrines concerning each. What is more, on the basis of that language and the principles that it reflects, the courts have articulated limits on the authority of the legislature to enact statutes that confer on the courts power that is not contained in the "judicial power." Thus, in *Rawls* and *Ballot Title,* the

---

[12] In making that point, Judge Brewer offers an extended digression regarding the flaws in the United States Supreme Court's decision in *Lujan,* citing professors Davis and Pierce. As we have noted, *Lujan* certainly has its critics. But nearly all—including Davis and Pierce—assault the underlying premise of the decision that there is a practical effects requirement in the first place, not that the decision's conclusion does not necessarily follow from that premise. Judge Brewer—unlike Davis and Pierce—purports to *accept* the premise that the constitution imposes a practical effects requirement while at the same time attempting to endorse the conclusion of commentators who do not accept that very premise. Logically, Judge Brewer cannot have it both ways, as even the critics on whom he relies concede.

Supreme Court emphatically held that the legislature lacks the constitutional authority to confer the right to seek from the courts a decision in a nonjusticiable case.

Judge Brewer insists that those cases are distinguishable, because they involved different elements of justiciability than the practical effects element that is at issue in this case. 176 Or App at 585 n 1. But if the practical effects requirement is indeed a constitutional requirement—as Judge Brewer expressly acknowledges—we perceive no principled basis for treating that element differently. Just as the legislature cannot simply declare that the elements of ripeness, mootness, and adversity have been satisfied, it necessarily follows that the legislature likewise cannot simply declare—in administrative agency actions or any other case—that the practical effects element has been satisfied.

We therefore reject the contentions of the League and the dissenting opinions and conclude that the League has failed to demonstrate the justiciability of its petition.

Dismissed.

**EDMONDS, J.,** concurring.

I agree with the majority's opinion in this case, but I write separately to express my understanding of the ramifications of the majority's analysis.

The beginning point of the analysis is with the language of Article III, section 1, of the Oregon Constitution. It provides:

> "The powers of the Government shall be divided into three seperate [*sic*] departments, the Legislative, the Executive, including the administrative, and the Judicial: and no person charged with official duties under one of these departments, shall exercise any of the functions of another, except as in this Constitution expressly provided."

Article VII (Amended), section 1, of the Oregon Constitution, provides, in relevant part, that "[t]he judicial power of the state shall be vested in one supreme court and in such other courts as may from time to time be created by law."

At issue is whether ORS 197.850(1) and (3)(a) encroach on the "judicial power" as contemplated by the constitution. Those provisions provide, in relevant part, that

"[a]ny party to a proceeding before the Land Use Board of Appeals under ORS 197.830 to 197.845 may seek judicial review of a final order issued in those proceedings[,]" and "[j]urisidiction for judicial review of proceedings under ORS 197.830 to 197.845 is conferred upon the Court of Appeals." As the majority correctly reasons, Article III, section 1, prohibits the legislature from conferring authority to conduct judicial review on this court in such a manner that would cause the court to exercise the function of the executive. Under the constitution, the legislature is at liberty to make any individual or entity that it desires a party to an *executive* proceeding, including a party who represents only the public interest, rather than a personal interest. Consequently, there is nothing unconstitutional, insofar as Article III, section 1, is concerned, about the provisions of ORS 197.830 that permit any person or organization who has appeared before the local government, special district or state agency to appear as a party before the Land Use Board of Appeals (LUBA). Where the legislature potentially runs afoul of Article III, section 1, is in the conferral of judicial review of LUBA's decisions on this court, without regard for the fact that executive proceedings may lack a justiciable controversy. The vice of the statute is in its breadth—it has no mechanism, like the "aggrievement" requirement of ORS 183.480(1), by which it limits the right of judicial review to those parties who have a personal stake in the outcome of the proceeding.

In this case, the League of Women's Voters seeks review of LUBA's decision when, based on the record before us, it has no personal stake in the matter. Any opinion as to it will necessarily be purely advisory. As the majority aptly points out, the judicial power does not include the power to issue advisory opinions. Consequently, I agree that ORS 197.850(1) and (3)(a), taken together, violate Article III, section 1, insofar as those provisions require this court to exercise a function of the executive department, *i.e.*, to review that department's decision when there is no justiciable controversy.

Haselton and Linder, JJ., join in this concurrence.

**DEITS, C. J.,** dissenting.

I agree with the majority that, under Article VII (Amended) of the Oregon Constitution, there are limits on

the authority of the legislature to regulate access to the courts. However, for the reasons that I will discuss, I do not agree with the majority that the legislature's grant of "standing" to seek judicial review of land use decisions in ORS 197.830 and ORS 197.850 exceeds constitutional limits. In my view, this case presents a justiciable controversy because the statutory standing requirements are satisfied as well as all of the elements necessary to establish justiciability. Therefore, the case should not be dismissed.

The majority is correct that the existence of a justiciable controversy is a prerequisite to a court's consideration of a matter. There are four categories of issues that are pertinent in assessing whether a justiciable controversy exists: standing, ripeness, adversity, and mootness. Each of those categories concerns whether there is a genuine controversy before the court. Standing involves whether the party in question has a *legally recognized interest* in the case; ripeness involves whether the case is at a stage where it is possible for a court to make a meaningful decision; adversity involves whether the parties are actually taking different positions so that there is a real dispute; and mootness involves whether a decision would have any real or practical effect on or concerning the rights of the parties. If a case fails to satisfy any one of those categories, there is nothing for a court to decide.

My disagreement with the majority relates to what is necessary to establish standing for purposes of justiciability. The majority concludes that standing for purposes of justiciability involves more than the question of whether the party seeking judicial review has a legally recognized interest as defined by the applicable standing statute. The majority holds that there is a constitutional component to standing. In this case, according to the majority, the fact that petitioner satisfies the standing requirements for review of a land use decision set forth in ORS 197.830(2) and (7) is not enough to provide standing for purposes of the justiciability inquiry. It is the majority's view that, in addition to meeting the requirements of ORS 197.830, petitioner must also show, *as part of its demonstration of standing,* that a decision by the court would have a "practical effect" on its rights. The majority concludes that that showing, as a part of the standing inquiry, is a prerequisite to the constitutional exercise of the

judicial power and that the legislature lacks the authority to abrogate this power by attempting to grant standing in circumstances in which that showing cannot be made. I disagree.

The majority believes that its conclusion is driven by federal, as well as Oregon, case law. The federal cases concerning the case or controversy clause of Article III of the United States Constitution address issues common to the Oregon courts' consideration of the scope of the "judicial power" under Article VII (Amended) of the Oregon Constitution. Not surprisingly, our courts have at times referred to and relied on language from federal cases. The Oregon courts, however, have never adopted the federal approach. Our Supreme Court, in fact, has cautioned against placing too much emphasis on federal law relating to standing. In *Strawberry Hill 4 Wheelers v. Benton Co. Bd. of Comm.*, 287 Or 591, 609 n 8, 601 P2d 769 (1979), the court noted:

> "References to 'standing,' without more, risk treating this term as a generic concept whose contours may be drawn indiscriminately from decisions interpreting diverse statutes or U S Const art III, § 2, or from the academic literature. *But statutes often provide differentiated requirements for 'standing' before an agency or to obtain different judicial remedies. See, e.g., Gruber v. Lincoln Hosp. Dist.* [,] 285 Or 3, 588 P2d 1281 (1979) (declaratory judgment); *Marbet v. PGE* [,] 277 Or 447, 561 P2d 154 (1977) (administrative procedure act)."

(Emphasis added.) Although the majority is right that there is some "murkiness" in our case law regarding standing as it relates to justiciability, I do not agree with its understanding of that law: namely, that above and beyond any statutory requirements for standing, Article VII (Amended) imposes a general requirement that a certain type and magnitude of interest must always be demonstrated to establish standing for purposes of justiciability.

The majority states that, by the beginning of the last decade, Oregon courts had settled on a justiciability analysis that has been consistently applied and that that analysis has included consideration of the "practical effect on the rights of the parties." Contrary to the majority's assertions, I do agree

that the practical effects on the rights of the parties is a pertinent consideration in determining the justiciability of a matter. However, the consideration of practical effects has always been in the context of satisfying the specific requirements of a statutory standing requirement, commonly the statutory requirements for bringing a declaratory judgment action, or it has been related to mootness, not standing. We have consistently equated the practical effects aspect of justiciability with mootness. For example, in our decision in *State v. Lavitsky*, 158 Or App 660, 663, 976 P2d 82 (1999), we stated:

> "Determining *whether a case is moot* is part of a larger two-part inquiry into whether a case is justiciable. *Brumnett v. PSRB*, 315 Or 402, 405, 848 P2d 1194 (1993). The first part of that inquiry is whether a case presents a controversy between parties with adverse interests. *Id*. The second element is whether the court's decision will have a practical effect on or concerning the rights of the parties. *Id*. at 405-06. *See also Barcik v. Kubiaczyk*, 321 Or 174, 182, 895 P2d 765 (1995)[.]"

(Emphasis added.) In *Joint Council of Teamsters #37 v. BOLI*, 168 Or App 398, 407, 11 P3d 247, *rev den* 331 Or 429 (2000), we said:

> "*Brumnett* * * * prescribes a two-part inquiry into whether a case is justiciable. The first question is whether a case presents an actual and substantial controversy between parties having adverse legal interests. *Id*. The second question is whether the court's decision will have a practical effect on the rights of the parties, *i.e., whether the case is moot. Id.*"

(Emphasis added.)

Contrary to the majority's assertions, Oregon courts have consistently considered whether a party has standing in terms of the specific statute defining who may seek judicial review of a particular matter. The Oregon courts have not held that there is a generic standing requirement imposed by constitutional considerations that exists independent of the statutory standing requirement and that requires that a certain magnitude of interest be satisfied before the other

aspects of justiciability—adversity, ripeness and lack of mootness—are even considered.

In our recent decision in *Poddar v. Clatsop County*, 167 Or App 162, 169, 2 P3d 929, *adhered to on recons* 168 Or App 556, 7 P3d 677, *rev den* 331 Or 193 (2000), for example, we began our discussion of standing by noting that we should not lose sight of the fact that standing is not a generic concept: what constitutes standing depends on the specific statutory standard in the particular case. We quoted from the Supreme Court's decision in *Eckles v. State of Oregon*, 306 Or 380, 384, 760 P2d 846 (1988), *appeal dismissed* 490 US 1032, 109 S Ct 1928, 104 L Ed 2d 400 (1989):

> "One other source of confusion is the habit of treating standing as if it were a generic concept unrelated to the specific legal relief requested by a party. This court has noted on more than one occasion that whether a person is entitled to seek judicial relief depends upon the type of relief sought and commonly is governed by a specific statutory standard. A person with standing to seek one type of relief will not necessarily have standing to seek any other type of relief. *Because plaintiff sought declaratory and injunctive relief, we must decide the issue of his standing by looking to the specific statutes and cases governing his right to seek these types of relief.*"

(Emphasis added; citations and footnotes omitted.) We went on in *Poddar* to conclude that, in light of the statutory standing requirements applicable to the plaintiff's claims for declaratory and injunctive relief, the plaintiff did not adequately demonstrate a sufficient interest to establish standing. 167 Or App at 170.

The Supreme Court has never suggested that there is any constitutional infirmity with legislatively created standing or the legislatively created rights that necessarily provide the foundation for it.[1] To the contrary, the court has

---

[1] The majority's discussion of standing may also implicate separation of powers considerations. The power to define "rights"—which parties may seek to protect through the judicial process—is properly part of the "legislative power," which is vested in the Legislative Assembly. Or Const, Art IV, § 1(1); *see Smothers v. Gresham Transfer, Inc.*, 332 Or 83, 112, 23 P3d 333 (2001) (suggesting that, apart from "'absolute' common-law rights," definition of legally protectable rights is province of legislature); *Swett v. Keisling*, 171 Or App 119, 125, 15 P3d 50 (2000), *rev allowed* 332 Or 250 (2001) (legislature has plenary power to legislate on any matter not limited by federal or state constitution).

repeatedly stated that questions of standing are to be resolved by referring to statutes. As the Supreme Court stated in *Local No. 290 v. Dept. of Environ. Quality*, 323 Or 559, 566, 919 P2d 1168 (1996):

> "When it is ruling on a standing issue, a reviewing court must focus on the wording of the particular statute at issue, because standing is not a matter of common law but is, instead, conferred by the legislature."

*People for Ethical Treatment v. Inst. Animal Care*, 312 Or 95, 99, 817 P2d 1299 (1991) ("Standing * * * is conferred by the Legislative Assembly."); *Eckles*, 306 Or at 383-84 ("To say that a plaintiff has 'no standing' is to say that the plaintiff has no right to have a tribunal decide a claim under the law defining the requested relief [.]" "[W]hether a person is entitled to seek judicial relief * * * commonly is governed by a specific statutory standard."); *Benton County v. Friends of Benton County*, 294 Or 79, 82, 653 P2d 1249 (1982) (" 'Standing' is not common law. Some statutes expressly provide who may seek review of specific governmental actions."); *Associated Builders and Contractors v. Tri-Met*, 170 Or App 271, 12 P3d 62 (2000).[2]

In the decisions relied on by the majority for the proposition that there is a generic constitutional requirement for purposes of proving standing, the court does not discuss any such generic requirement. Rather, the court's focus is on the specific requirements of the statute defining standing for the particular kind of case involved. In *Gruber*, for example, the court discussed whether the plaintiff had a sufficient interest to bring the case and, consequently, whether the plaintiff's interest met the statutory standing requirement. The applicable statutory standing requirement was the Declaratory Judgment Act, which provided:

---

[2] I acknowledge that there are also comments from the Supreme Court that can be read as leaving open the question of whether standing has a constitutional component in Oregon. *People for Ethical Treatment*, 312 Or at 99 ("[A]side from certain constitutional considerations not presented by this case, a reviewing court's inquiry into the standing of an entity seeking judicial review is confined to an interpretation of legislative intent."); *Marbet*, 277 Or at 457 n 4 ("It is not contended here that the standing conferred by ORS 183.480 exceeds 'the judicial power of the state[.]' "). In my opinion, however, the court has made direct and frequent statements that standing is a matter for the legislature to determine by statute. Those statements control.

"Any person interested under a deed, will, written contract or other writing constituting a contract, or whose rights, status or other legal relations are affected by a constitution, statute, municipal charter, ordinance, contract or franchise may have determined any question of construction or validity arising under any such instrument, constitution, statute, municipal charter, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder."

*Gruber*, 285 Or at 6.

Similarly, in *Eckles*, the court focused on the statutory standing requirement, again the Declaratory Judgment Act. The court concluded:

"The *statute's reference* to an effect on 'rights, status or other legal relations' requires a plaintiff seeking declaratory relief to allege 'some injury or other impact on a legally recognized interest beyond an abstract interest in the correct application or the validity of a law.' *Budget Rent-A-Car v. Multnomah Co.*, 287 Or 93, 95, 597 P2d 1232 (1979). The interest perhaps most often recognized as sufficient for standing under ORS 28.020 is a present or foreseeable financial interest, such as that of a taxpayer, *e.g., Lipscomb v. State Bd. of Higher Ed.*, [305 Or 472, 753 P2d 939 (1988)], but many other interests have been recognized as well, including the interests of voters, *e.g., Webb v. Clatsop Co. School Dist. 3*, 188 Or 324, 331, 215 P2d 368 (1950), and of users of a road, *e.g., Rendler v. Lincoln Co.*, 302 Or 177, 182, 728 P2d 21 (1986). On the other hand, a taxpayer who alleged only an interest in the proper expenditure of public funds without alleging that the challenged government action would have an effect on his taxes was held to have no standing, *Gruber*[, 285 Or at 8], and parents whose son had been murdered had no standing to obtain a declaration setting forth limits on the Governor's power to commute the death sentence of their child's murderer, *Eacret et ux v. Holmes*, 215 Or 121, 124-25, 333 P2d 741 (1958)."

*Eckles*, 306 Or at 385 (emphasis added). *See Gortmaker v. Seaton*, 252 Or 440, 450 P2d 547 (1969); *Oregon Cry. Mfgs. Ass'n v. White*, 159 Or 99, 78 P2d 572 (1938); *Erwin v. Oregon State Bar*, 149 Or App 99, 941 P2d 1094 (1997); *deParrie v. State of Oregon*, 133 Or App 613, 893 P2d 541, *rev den* 321 Or 560 (1995).

The majority concludes that the legislature may not *deem* a matter to be justiciable; in other words, that the legislature is without authority to alter the requirements of justiciability. I agree. The legislature may not deem a matter to be justiciable. Clearly, the legislature may not alter the requirements necessary to establish the constitutional aspects of justiciability—adversity, ripeness, and a lack of mootness. Failure to establish the constitutional aspects of any of those elements of justiciability will compel the dismissal of a case. With respect to standing, however, the Oregon courts have not held that the legislature is without authority to define the interests of the parties necessary to establish standing; in other words, to define who has a legally protected interest in a matter.

Significantly, the majority does not cite any case in which statutory standing requirements were met where the case was dismissed for lack of justiciability other than on grounds of lack of adversity, ripeness, or mootness.[3] *E.g.,* *Oregon Cry. Mfgs. Ass'n,* 159 Or at 110-11 ("plaintiffs' case is not ripe for judicial determination" where the defendant "*might* promulgate and enforce some regulation or rule which *might* affect their business"; does not use "practical effects in rights of the parties" phrase) (emphasis in original); *Eacret,* 215 Or at 124-25 (plaintiffs lacked particularized interest apart from public at large—*i.e.,* no *statute* created standing—and, accordingly, did not have standing).

As mentioned above, I do agree with the majority that there is some murkiness in our case law relating to the relationship between standing and justiciability. I would acknowledge that the court's discussion in *McIntire v. Forbes,*

---

[3] The majority states that I am wrong in stating that the Oregon courts have never dismissed a case because of a failure to meet the practical effects requirement and cites a number of cases which were dismissed for failure to meet the practical effects requirement. 176 Or App at 553. However, the majority misreads my statement. I state that the Oregon courts have not dismissed a case, for lack of a justiciable controversy, *in which statutory standing requirements have been met,* other than on grounds of mootness, lack of adversity or ripeness. 176 Or App at 568. The cases that the majority cites, *Eacret, Poddar, Erwin,* and *deParrie,* as examples of cases that involved dismissals because the plaintiffs' interests were insufficient to satisfy the "constitutional practical effects requirement," were dismissed because the plaintiffs did not have a sufficient interest to satisfy the applicable *statutory* standing requirement.

322 Or 426, 909 P2d 846 (1996), includes language which could be read to import a generic constitutional practical effects requirement into the consideration of standing. The majority relies on the court's statement that "[t]here are two aspects to the analysis of justiciability in this case. The first relates to the standing inquiry: will a decision have a practical effect on the rights of the parties?" *Id.* at 433. This statement is admittedly somewhat confusing. Reading the statement in the context of the entire opinion, however, shows that the discussion of standing focuses on the *statutory* standing requirement and that the discussion of practical effects in *McIntire* is about mootness and only about mootness. The *McIntire* decision, in fact, illustrates that, contrary to the majority's assertion, standing and mootness involve different questions.

The court in *McIntire* begins its discussion of standing by noting that the intervenor "questions petitioners' standing to bring this action *and* the justiciability of this case." *Id.* at 431. It then discusses standing under a separate section labeled "A. *Statutory Standing*." *Id.* (emphasis in original). That entire discussion concerns the statutory requirement that a petitioner must be an "interested person" under the statute. *Id.* at 431-32. In section B of its discussion, the court concluded that the petitioners in the case were interested persons with standing *under the statute. Id.* at 433. The court then moves to the section entitled "C. *Justiciability*." *Id.* (emphasis in original). It is at the beginning of this discussion that the court makes the statement cited above and relied on by the majority. Immediately after making that statement, however, the court goes on to quote from *Barcik*, a mootness case, which itself quoted *Brumnett*, another mootness case, to explain the standards for a justiciable controversy under Oregon law.

The issue in *Brumnett* was whether a challenge to a decision in which PSRB refused to release the petitioner from its jurisdiction became moot when PSRB subsequently released him. In discussing that issue, the court stated that there must be a justiciable controversy, because a court will not decide an abstract, hypothetical, or contingent question. After noting that a preliminary question is whether the interests of the parties are adverse, it turned to whether

"the court's decision in the matter will have some practical effect on the rights of the parties to the controversy. *See Warren v. Lane County,* 297 Or 290, 686 P2d 316 (1984) (*to determine whether judicial review from land use decision is moot, one must determine whether a decision will have practical effect; if there still is a practical effect, the controversy is not moot).*

"Cases that are otherwise justiciable, but in which a court's decision no longer will have a practical effect on or concerning the rights of the parties, will be dismissed as moot."

*Brumnett,* 315 Or at 405-06 (emphasis added). The court then held that the most that the petitioner could show was the possibility that the state might, some time in the future, seek to recover money for the cost of his care. That mere possibility was insufficient to avoid mootness. *Id.* at 406-07.

When the court in *Brumnett* considered whether its decision would have a practical effect on the rights of the parties, it was examining whether the case was not justiciable because it was moot. Both we and the Supreme Court have treated *Brumnett* as a mootness case ever since. *See, e.g., Shasta View Irrigation Dist. v. Amoco Chemicals,* 329 Or 151, 166, 986 P2d 536 (1999); *State v. Dick,* 169 Or App 649, 650, 10 P3d 315 (2000); *Joint Council of Teamsters #37,* 168 Or App at 407. That is, the reference to whether a decision would have a practical effect on the rights of the parties has not been considered as an aspect of standing except as it pertains to the applicable statutory standing requirement. The rights of the parties to which the court referred were the rights that the parties had standing to assert—in *Brumnett,* the validity of PSRB's order. The question of justiciability that the court decided in *Brumnett* was mootness—whether a decision at a particular time would have a practical effect on those rights.[4]

---

[4] The majority relies on language from *Brumnett* to support its point that the practical effects requirement relates to establishing standing. As noted above, it points to the court's statement that " '[a] second requirement for a justiciable controversy is that the court's decision * * * will have some practical effect on the rights of the parties to the controversy.' " 176 Or App at 540 (quoting *Brumnett,* 315 Or at 405). The majority, however, does not include the citation that follows this language which supports my view that practical effects relates to mootness. That additional language from *Brumnett* states:

In light of the cases on which it relied and the fact that the court's only discussion of standing concerns the application of the statutory standard, in my view, the only thing that the court in *McIntire* decided in its discussion of practical effects was that the controversy was not moot. Its reference to the preceding discussion concerning standing simply indicated that, as in *Brumnett*, the nature of the plaintiffs' standing defined the rights that the court examined to decide whether the case was moot: that is, whether a decision of the case would have a practical effect on the statutory rights that gave the plaintiffs standing.

Consistent with the above case law, our consideration of whether petitioner here has standing must begin with "looking to the specific statutes and cases governing" this type of relief. *Eckles*, 306 Or at 384. In ORS 197.830(2) and (7), the legislature created an unusually broad definition of standing for land use decisions. The legislature apparently decided that any person or entity that plays a serious role at the appropriate stages of the decision-making process should have standing to seek review of a decision that is contrary to the position that it took. The legislature gave such persons and entities a legally recognized right to continue to participate in the process. That action may well reflect its recognition that without citizen involvement—which, under Goal 1, is an essential part of the land use decision-making process—it would be impossible to ensure that local decisions comply with the law's requirements. In any case, in *Jefferson Landfill Comm. v. Marion Co.*, 297 Or 280, 686 P2d 310 (1984), the Supreme Court made it clear that the statute means exactly what it says.

Petitioner here met the statutory standing requirement. As discussed above, however, once that hurdle is crossed, the justiciability of the controversy must still be established. The justiciability of the controversy was established here. This case is at a stage where the court can make

"*See Warren v. Lane County*, 297 Or 290, 686 P2d 316 (1984) (to determine whether judicial review from land use decision is moot, one must determine whether a decision will have practical effect; if there still is a practical effect, the controversy is not moot)."

315 Or at 405-06.

a meaningful decision—it is ripe. There is a real dispute—this would not be an advisory opinion—there is adversity. The decision will have a practical effect on or concerning the rights of the parties—respondents' right to use specific property and petitioner's legally recognized right as an interested participant in this land use decision. This is not an abstract, hypothetical, or contingent question—it is not moot.

In summary, we should determine that the case is justiciable and proceed to decide it on the merits. The first issue on the merits concerns the parties' contentions as to the operation of the motocross race track on exclusive farm use (EFU) land. Petitioner, the League of Women Voters of Coos County (League), and the Department of Land Conservation and Development (DLCD) argue that LUBA erred in concluding that a motocross racetrack is permissible on EFU land. According to the League and DLCD, LUBA's analysis was flawed in resting on the simple dictionary definition of the term "park."

I agree with the League and DLCD that LUBA's analysis was not correct. It is not sufficient to rely on the dictionary definition of the term "park" in determining the scope of permitted uses under ORS 215.283(2). Such reasoning would permit, among other things, the replication of Yankee Stadium or Disneyland on land zoned EFU, a construction of the statute that we take is self-evidently unlikely. As we noted in *Steele v. Employment Department*, 143 Or App 105, 113-14, 923 P2d 1252 (1996), *aff'd* 328 Or 292, 974 P2d 207 (1999), the dictionary is only the beginning of the process of statutory construction:

> "[M]any of the words in our language have several meanings or shades of meaning. However, it does not follow from the fact that there are several variations of how a word is defined in the dictionary that all of the variations are pertinent whenever the word is used, or that each variation is an arguably plausible description of what the word means as it is used in a particular statute. The subject and purpose of the statute, together with the statutory language that surrounds the word in question, narrow the array of definitional choices that dictionaries alone afford and go far in identifying the intended meaning of the word as used in the statute."

I agree with LUBA that the term "park," at least conceptually, may encompass land devoted to a number of different recreational activities. My problem is with LUBA's conclusion that *all* recreational uses are therefore permissible under ORS 215.283(2)(c) in *any* private park in an agricultural zone.

It is true that, as LUBA noted, neither Goal 3—pertaining to agricultural lands—nor the agricultural lands statutes contain an *express* limitation on recreational uses to those that are "appropriate" to the surrounding land. Nevertheless, the pervasive theme in both Goal 3 and the statutes is the preservation of agricultural land for farm use. *See, e.g.,* ORS 215.243. Accordingly, this court has consistently interpreted ORS 215.213 and ORS 215.283 restrictively. *See, e.g., McCaw Communications, Inc. v. Marion County,* 96 Or App 552, 773 P2d 779 (1989). Perhaps more significantly, implementation guideline B.1 of Goal 3 provides:

> "Non-farm uses permitted within farm use zones under ORS 215.213(2) and (3) and 215.283(2) and (3) should be minimized to allow for maximum agricultural productivity."

In light of the foregoing contextual authorities, I do not agree that ORS 215.283(2)(c) allows recreational uses without limitation in private parks in EFU zones. Those authorities demonstrate instead a legislative intent to limit the nature and intensity of recreational uses on farmland to at least the same extent that Goal 4 limits recreational activities on forest land. Given that, I would conclude that, for the same reasons that LUBA determined that the motocross racetrack component is impermissible on forest land, it also is impermissible on land zoned EFU, as a matter of law.

It is next necessary to address the OHV trail system component of the proposed development. The League again charges that LUBA's analysis was improperly based on simple reliance on the dictionary and that, taking into account the relevant statutory and regulatory context, it is clear that an OHV trail system, like a motocross racetrack, is impermissible on EFU or forest land. As explained above, I agree that LUBA erred in its analysis. I would not hold, however, that, as a matter of law, an OHV trail system is categorically

impermissible. I would note, in particular, that LCDC's rules apparently expressly permit off-road vehicle trails in public parks. That indicates that LCDC considered that uses of that kind at least *could* be an appropriate use on EFU and forest lands and that there should be a case-by-case analysis to determine whether a proposed OHV trail is appropriate under ORS 215.283(2)(c). That inquiry must take into account the intensity of the particular proposed use and other factual variables considered in the context of Goal 3. Accordingly, I believe the appropriate remedy would be to remand for LUBA to reconsider the OHV trail issue, either independently or by a remand to the county, as LUBA sees fit.

The League advances two other assignments, only one of which merits discussion. The League contends that LUBA erred by not expressly requiring that, on remand, the county must apply ORS 215.296 to the "special events" aspect of the Lillies' proposal. The Lillies nominally oppose the assignment of error, but they acknowledge that the remand that LUBA ordered implicitly requires the county to apply ORS 215.296 to the issue. I agree and would make the requirement explicit. For all of the above reasons, I respectfully dissent.

Armstrong, J., joins in this opinion.

**ARMSTRONG, J.,** dissenting.

The majority dismisses our review of a decision of the Land Use Board of Appeals (LUBA) on the ground that petitioner's claims are not justiciable. It reaches that conclusion by holding that petitioner failed to establish that it has an interest in the dispute that meets the constitutional requirements for it to obtain judicial relief. The majority's decision is based on a fundamental misunderstanding of the judicial power and of the authority of the Oregon Legislature to modify the law that bears on who has standing to invoke that power.

The function of courts is to adjudicate disputes between contestants. That means that the necessary elements of a justiciable controversy are contestants, a dispute, and relief that a court can grant regarding the dispute. Every

Oregon case that has held a case to be nonjusticiable as a constitutional matter, that is, on the ground that the Oregon Constitution barred Oregon courts from adjudicating it, has involved an absence of one of the necessary elements.

Oregon cases have held, for example, that a dispute is not justiciable if it is not ripe or is moot.[1] Both of those principles implement the requirement for a justiciable controversy that it be one in which a court can grant effective relief. A case that is ripe is one in which judicial relief is necessary to resolve the dispute, because nothing remains to be done that could obviate the need to obtain judicial relief. Conversely, a case is not ripe if steps remain to be taken that could lead to a circumstance in which there is no need for judicial relief. Similarly, a moot case is one in which there is no judicial relief to grant, because the result that the contestants seek to achieve in the case has already been achieved or there is no way to grant relief that would achieve it.

Oregon courts have also rejected as nonjusticiable cases in which there is no genuine dispute between the contestants. The most prominent example of such a case is *Oregon Medical Association v. Rawls*, 281 Or 293, 574 P2d 1103 (1978), which involved an action in which the plaintiff sought a declaration that a statute that the defendant administered was constitutional. There was no dispute between the plaintiff and the defendant about the constitutionality of the statute, so the case was not justiciable.

There also are Oregon cases involving the third of the three requirements for a justiciable controversy: the requirement that there be contestants on opposite sides of it. *Gruber v. Lincoln Hospital District*, 285 Or 3, 588 P2d 1281 (1979), is a good example of such a case. *Gruber* involved an action by a taxpayer and resident of the defendant hospital district who sought declaratory and injunctive relief against the enforcement of a contract between the defendant and a physician. Because the plaintiff brought the action under the state Declaratory Judgment Act, he had to meet the standing

---

[1] *See, e.g., McIntire v. Forbes*, 322 Or 426, 434-35, 909 P2d 846 (1996); *Brumnett v. PSRB*, 315 Or 402, 405-06, 848 P2d 1194 (1993).

requirement established by the act, which meant that he had to be someone whose "rights, status or other legal relations" were affected by the contract about which he sought a declaration. *See id.* at 6-7; ORS 28.020. The court held that the plaintiff had failed to allege facts that met that standard, so the case was not justiciable because it lacked a necessary contestant: a plaintiff who could bring it.

Significantly, *Gruber* and the other Oregon cases involving the third justiciability requirement—the requirement that there be contestants—have all involved instances in which the plaintiffs failed to meet the legal standards established by the legislature or the courts for who could be contestants in a particular dispute. No Oregon case of which I am aware has held or even suggested that a standard set by the legislature for who could be a contestant in a case violated a constitutional limit on who could be one.[2]

The reason that there is no such case is because it is unclear that there is such a limit. In contrast to the three, fixed requirements for a justiciable controversy—contestants, a dispute, and the ability to grant relief—the content of the three requirements is subject to adjustment by both the legislature and the courts. In other words, who can be contestants, the disputes that are justiciable, and the relief that courts can grant are all subject to change. The Oregon cases have all dealt with the *absence* of one of the three requirements. None has suggested that there are constitutional limits on the choices to be made by the legislature and the courts concerning the *content* of those requirements.[3]

In that light, it should be apparent that the majority has taken a radical step in this case. It holds that there is a

---

[2] In *Gruber*, for example, the court referred to the ongoing debate over taxpayer and other forms of citizen standing to challenge governmental actions and suggested that the resolution of the issues presented by that debate "must await a systematic reexamination of the *statutory* framework of judicial review." *Gruber*, 285 Or at 7-8 & n 2 (emphasis added). The court did not suggest that there was a constitutional dimension to that debate.

[3] *I do not mean to imply that the freedom to adjust the content of those elements is truly limitless. An adjustment to an element that has the effect of eliminating it is not permitted. See, e.g., Rawls, 281 Or at 296-300. That means that the legislature and the courts cannot make justiciable a case that lacks contestants who have a genuine dispute on which a court can grant effective relief.*

limit imposed by the Oregon Constitution on the legislature's authority to determine who can be a contestant in an Oregon court in a case involving judicial review of a governmental action undertaken by a body charged with complying with a regulatory regime established by the legislature. No Oregon case has done that or anything remotely similar to it.

It is undisputed that the legislature and the courts have authority to adjust the content of the three justiciability elements and to make disputes justiciable that, before the adjustments, were not. For example, the legislature enacted the Oregon Administrative Procedures Act, which altered the body of disputes that could be adjudicated in Oregon courts, the contestants who could bring them, and the relief that could be granted in them.[4] It did the same thing when it enacted the Declaratory Judgment Act.[5]

Courts have done that as well. Whenever they recognize a new claim for relief they expand the group of contestants and disputes that can be heard in court. For example, before courts recognized the tort of intentional infliction of emotional distress, people who suffered extreme emotional distress from actions directed against them by others did not suffer an effect that the law would recognize, so there was no dispute about the objectionable conduct to adjudicate.

As Oregon courts have developed that tort, they have been careful to impose strict limits on it, by requiring the emotional distress to be extreme and the conduct giving rise to it to be outrageous in the extreme.[6] What if, instead, Oregon courts chose to expand the claim to cover any emotional distress caused by unlawful or unprivileged conduct and to provide that the relief that a court would award for claims involving emotional distress that fell short of extreme distress was a required apology from the tortfeasor. Leaving aside the wisdom of that, the effect of doing it would be to give legal recognition to an interest in being free from emotional

---

[4] *See* ORS 183.310 to ORS 183.550.

[5] *See* ORS 28.010 to ORS 28.255.

[6] *See, e.g., Hall v. The May Dept. Stores,* 292 Or 131, 134-37, 637 P2d 126 (1984).

distress caused by the specified conduct and to create a remedy for that distress that would have meaning to people. That would appear to make claims for that relief justiciable—because there would be contestants, a genuine dispute, and effective relief to be granted on the claims—even though the interest addressed by the claim and the relief granted on it are not now legally cognizable.

The point is that the interests that can give people a basis to seek judicial relief are not static or constitutionally fixed. Emotional, psychological, and aesthetic reactions to governmental actions are real even if they cannot readily be quantified in money. If a governmental action would impose a $100 cost on a person, the person would have a recognized stake that would entitle the person to seek judicial relief against the action, even though it would cost more than that amount to hire a lawyer to prevent the imposition of that cost. If, instead of a monetary cost, the proposed governmental action would have consequences sufficiently important to the person to move her to incur the time and expense to challenge it, why has she not put a price on the value to her of stopping the action that a court or legislature could recognize?[7] Nothing about the nature of the judicial power suggests to me that the Oregon Constitution prevents the courts or the legislature from implicitly recognizing interests of that kind by giving people a broad right to challenge governmental actions, so long as doing so does not substantially impair the ability of courts to adjudicate cases.[8]

---

[7] *See generally* William A. Fletcher, *The Structure of Standing*, 98 Yale LJ 221, 228-34 (1988) (discussing principle in terms of federal standing law). Petitioner self-evidently has an interest in having respondents in this case comply with the land use laws, otherwise it would not have bothered to take the actions that it did. The legislature has recognized that interest by giving participants in the local land use process the right to obtain judicial review of the legality of local land use decisions. A decision favorable to petitioner will vindicate its interest in having the government comply with the land use laws at issue in the case, and, as a consequence, the decision will have a practical effect on petitioner by ensuring compliance with those laws.

[8] The qualifying language in that statement recognizes that the separation-of-powers principle embodied in the Oregon Constitution prevents one branch of government from taking actions that substantially impair the ability of another branch to perform the functions that the constitution has assigned to it. *See, e.g.,* Note, *Probing the Limits of Legislative Power To Regulate the Bar*, 56 Or L Rev 387, 391 (1977). Nothing suggests that the grant of standing at issue in this case could conceivably impair the ability of courts to perform their adjudicatory role.

Oregon residents do not have a generalized right to live in a state in which the state and local governments comply with the law. Would Oregon courts act unlawfully if they recognized that right? If they did recognize it, would it not follow that claims by Oregon residents challenging the lawfulness of any state or local governmental action would be justiciable, because the people who brought the claims would have a legally recognized interest that would be protected through the relief that courts could grant against the unlawful conduct? Again, it might not be wise for Oregon courts to recognize such a right, but I do not believe that they would violate the Oregon Constitution if they did.[9]

Global warming is recognized by most climatologists to be a real phenomenon that conceivably could have harmful effects on everyone living on the planet in 40 to 50 years. Although the effect of any one energy-generating plant on the global climate is small, the harmful consequences of global warming may not be felt for a long time, and the effect of those consequences on any specific claimant is necessarily uncertain, all of us may nevertheless have a stake in energy facility siting decisions, or at least the legislature could reasonably believe that we do. If the legislature enacted a statute that gave everyone the right to participate in the energy facility siting proceedings of the Energy Facility Siting Council and gave every participant in those proceedings the right to seek judicial review of a decision whether to site an energy-generating facility, would that grant of a right to

---

[9] Most courts that have confronted the issue of taxpayer or citizen standing have chosen to recognize that type of standing to challenge governmental actions. *See, e.g.,* Louis L. Jaffe, *Standing To Secure Judicial Review: Public Actions,* 74 Harv L Rev 1265, 1276-78 (1961); Note, *Taxpayers' Suits: A Survey and Summary,* 69 Yale LJ 895, 900-02 (1960). By doing so, the courts have effectively recognized that taxpayers and citizens have an interest in having a government that complies with the law. If courts have the authority to permit taxpayers or citizens to seek judicial relief against unlawful governmental action without regard to whether they have a direct, personal stake in the action, it is difficult to see why the legislature lacks authority to do the same thing. In fact, judicial rejection of legislative authority to determine who has the right to seek judicial enforcement of laws enacted by the legislature presents a significant separation-of-powers problem. Professor William A. Fletcher makes that very point in the course of his trenchant critique of federal standing law. *See* Fletcher, 98 Yale LJ at 228-34. His discussion makes clear, at least to me, that federal standing law is analytically and doctrinally incoherent and constitutes a body of law that we should reject rather than embrace under the Oregon Constitution.

seek judicial review violate the Oregon Constitution? Would it make a difference to the analysis if the legislature enacted a statute that provided that everyone has a right to be free from state decisions that could have a harmful effect on the global climate? Leaving aside, again, the wisdom of such an enactment, would it not follow that anyone could seek judicial review of an energy facility siting decision, because everyone would have a legally cognizable interest that would be affected by the decision?[10]

Mandamus actions are proceedings that can be brought by people in the name of the state to compel governmental officials to comply with the law. Oregon law is not entirely clear about the interest that a relator must have in the action to entitle the relator to bring it.[11] Nevertheless, the state certainly has an interest in having its law enforced. If the state legislature is willing to deputize anyone who chooses to accept the assignment as a person who can act for the state to secure governmental compliance with state law, which is what it has done by giving people the ability to bring the proceeding in this case, has it violated the constitution?[12] Why would we be barred from adjudicating such a dispute?

---

[10] I am not sure that the enactment of a statute giving people the right to environmentally sound governmental decisions would affect the justiciability analysis, because the very decision to give people a right to seek judicial review of a governmental decision, which is what the legislature did in this case, gives them a legally cognizable interest in the proceedings. The legislature cannot create a dispute where there is none, see, e.g., Rawls, and it cannot require a court to act in a case where there is no effective relief that the court can grant, see, e.g., McIntire, but it can create rights and interests, and its very act in doing that affects the ability of the beneficiaries to obtain judicial relief to vindicate their interests.

[11] See, e.g., Putnam v. Norblad, 134 Or 433, 436-37, 293 P 940 (1930); State ex rel. Durkheimer v. Grace, 20 Or 154, 156-58, 25 P 382 (1890); State ex rel. Shaw v. Ware, 13 Or 380, 382-83, 10 P 885 (1886); see also Dickman et al v. School Dist. No. 62C et al, 232 Or 238, 244-45, 366 P2d 533 (1961), cert den 371 US 823 (1962) (holds that standing of plaintiff to bring an action is not jurisdictional).

[12] In other words, could the legislature enact a law that gave people the right to bring a court action in the name of the state to seek compliance by state and local officials with state law? I assume that it could, because, as noted, the state has an interest in having state and local officials comply with state law. If the legislature could do that without violating the constitution, why would it matter if it dispensed with the requirement that the state be named as the nominal plaintiff and gave people the right to bring the action directly? I can think of no reason why it would matter, which means that the legislature can do what it has done in this case.

Federal law gives people the authority to bring proceedings in the name of the federal government to recover certain funds to which the government is entitled.[13] A person who is successful in such a proceeding is entitled to receive a percentage of the amount recovered,[14] which serves as both an incentive for the person to act as a private attorney general to bring the action and, incidentally, gives the person an interest in it. Consistent with that model, the Oregon Legislature presumably could couple its grant of standing in Oregon land use cases with a right of the successful litigant to receive a $100 payment from the local government, thereby, in the majority's view, giving all litigants a personal stake in those cases and making them justiciable. If people would take the initiative on their own to seek compliance with the land use laws, why must the government create a further financial incentive in order to make the disputes justiciable?

Here, the legislature has given people who participate in a local land use proceeding the right to seek review by LUBA of the decision in that proceeding and, if dissatisfied with LUBA's decision, to seek review by us. The legislature essentially has determined that, by investing time, effort, and, often, money in trying to persuade a governmental body to comply with the land use laws, the participants have earned a cognizable stake in the proceeding that entitles them to seek judicial review to compel governmental compliance with the land use laws. I do not see how the constitution prohibits the legislature from making that choice.

There are, of course, legitimate policy concerns that bear on the decision to give people the right to seek judicial review of governmental actions. Perhaps the most prominent among them is the concern that people without a direct and meaningful stake in the proceedings will not litigate the matter effectively, which could lead to an erroneous decision that could have durable and untoward effects on others. I believe that that is one of the concerns that underlies the federal standing cases cited by the majority and the majority's decision itself.

---

[13] *See* 31 USC §§ 3729, 3730.

[14] *See id.* § 3730(d).

Whatever role that concern should play, it does not impose a constitutional limit on the legislature's authority to give people the right to adjudicate the legality of governmental actions undertaken pursuant to a legal regime established by the legislature. A broad statutory grant of standing has the effect of creating a body of private attorneys general who can act to ensure that the law enacted by the legislature is enforced. That benefit is balanced against the harm that those same people can have on the enforcement effort by making the enforcement process more cumbersome and costly and by litigating cases in which they are indifferent to the result or, worse, actually would prefer a result different from the one that they ostensibly seek. However, it is the legislature that must decide how to strike that balance. Nothing about the nature of the judicial power denies the legislature the authority to couple an enactment of substantive law with a grant of standing to people whom the legislature believes will help ensure the enforcement of that law. The legislature may be wrong about the benefits to be achieved from a particular grant of standing, such as its decision to give anyone who participates in a local land use decision the right to seek review of that decision with LUBA and with us, but its mistake is a prudential and not a constitutional mistake.

It should go without saying that the majority completely misconstrues my position. It contends that my analysis essentially permits the legislature to eliminate the practical effect requirement that the Supreme Court held in *Barcik v. Kubiaczyk*, 321 Or 174, 895 P2d 765 (1995), to be one of the constitutional requirements for justiciability. Because it permits the legislature to eliminate that requirement, it follows that my analysis would permit the legislature to eliminate all of the justiciability requirements, which means that my analysis cannot be reconciled with the Oregon cases that have made it clear that the legislature lacks the power to eliminate those requirements. 176 Or App at 555-56.

The majority is wrong. *Barcik*'s discussion of the practical effect requirement concerns mootness, which is concerned, in turn, with whether the relief that a court can grant will have any effect on the parties. If, as here, the state legislature has established that certain parties have a right to

secure lawful conduct by state and local governments, a decision that vindicates that right and prevents unlawful governmental conduct has a practical effect on the rights of those parties. Contrary to the majority's view, upholding that legislative judgment does not eliminate the practical effect requirement that is embodied in the requirement that the court be able to grant meaningful relief, and it does not open the door to legislative authority to eliminate the other justiciability requirements.[15]

I should note one final point. By law, every action filed in an Oregon court must be brought in the name of the

---

[15] *See, e.g.,* Fletcher, 98 Yale LJ at 247-49. The majority contends that my approach to justiciability will lead courts to issue advisory opinions. 176 Or App at 555-56. It will not, and this case confirms that it will not. Even if the relief awarded in this case will have no practical effect on petitioner, it will nevertheless cause respondents to take specific steps to comply with the land use laws, which means that the relief will do more than provide an answer to an abstract or hypothetical question. It will have a practical and immediate effect on the parties against whom petitioner sought court relief, which, for these purposes, is all that the Oregon Constitution requires. The point is further confirmed by comparing petitioner's situation with that of a neighbor of the proposed motorcycle park. Assume that petitioner and the neighbor separately seek review by LUBA and by us of the local government's approval of the park, and that we overturn the approval in both cases. Our decision certainly would not be an advisory decision as to the neighbor, but I do not see how it could be characterized as an advisory decision as to petitioner. The decision would do more than give either the neighbor or petitioner advice about the relevant land use law; it would enforce that law by requiring the local government to comply with it. The purpose of the practical effects component of the mootness doctrine is to prevent the issuance of advisory opinions. When the component is applied properly, it achieves that purpose. The majority misapplies it in this case by applying it to standing rather than mootness, which leads it to treat the decision in this case as advisory when it is not. Because most claims involve an effort to secure relief that is personal to the claimant, mootness generally focuses on whether the claimant will receive any benefit from the relief that a court could grant on the claims. If, as here, the claimant has a statutory right to seek governmental compliance with the land use laws, that right is not secure and the claim is not moot until the local government has complied with the law. In such a case, the court's decision will have a practical effect on the right that the claimant seeks to secure, which is governmental compliance with the law.

The majority also suggests that my analysis reflects a justiciability model that was first proposed in the 1970s and that could not have been contemplated by those who framed the Oregon Constitution in 1857. 176 Or App at 556 n 11. The same point could be made about the majority's analysis. It is based on a body of law that the United States Supreme Court began to develop in the 1930s that was no more within the contemplation of the drafters of the Oregon Constitution than was the body of law that the majority claims that I have advanced. *See, e.g.,* Fletcher, 98 Yale LJ at 224-28. The issue for us to resolve is whether this case is justiciable under the Oregon Constitution. I have no doubt that it is.

real party in interest. ORCP 26 A. If a person with a contractual claim assigns the claim to someone else, the claim must be brought in court by the person to whom the claim has been assigned. However, the objection that a claim has not been brought by the real party in interest is waived if it is not raised by motion or in a responsive pleading. *See* ORCP 21 G(2). Consequently, if the objection is waived, a contractual claim can be brought and litigated to judgment by a party for whom the decision in the case will have no practical effect. The decision will have a practical effect on the real party in interest, but that party will not be a party to the litigation. If the majority is right, it would appear that, contrary to ORCP 21 G(2), the objection that a claim has not been brought by the real party in interest cannot be waived, because the constitution bars adjudication of a claim that is brought by someone who lacks a stake in the outcome of it. That will come as a surprise to most lawyers and judges in Oregon.

To be sure, someone other than the defendant will be affected by litigation brought by a person other than the real party in interest, but, by the same token, someone other than respondents will be affected by the proceedings in this case. At a minimum, the state will be affected by the result in this case, because the state has an interest in having its land use laws enforced. If the state could be a petitioner in this proceeding, and I assume as a constitutional matter that it could, and if the state could authorize people to bring the proceeding on its behalf, and I assume, again, that it could, then the failure to name the state as the petitioner would constitute a failure to bring the proceeding in the name of the real party in interest, but that would be a waivable defect.[16] The state has essentially created a legal regime in which it has dispensed with the requirement that proceedings of this kind be brought in its name by a party authorized to act on its behalf. Instead, it has authorized people who meet certain criteria to bring the proceedings directly, thereby waiving as a matter of law the objection that the proceeding has not been

---

[16] ORCP 21 G(2) does not, in fact, apply to this case, because the Oregon Rules of Civil Procedure do not, by their terms, apply to judicial review proceedings. *See* ORCP 1 A. However, the waiver principle that it embodies is relevant to the justiciability issue in the case. *See Dickman,* 232 Or at 244-45 (holding that standing of plaintiff to bring an action is not jurisdictional).

brought by the real party in interest. If the Oregon Constitution would permit the state to do what I have just described, and I believe that it would, I do not believe that it operates to make this case nonjusticiable.

In summary, this case has a contestant that the legislature has determined can be a contestant that can seek governmental compliance with the state land use laws, there is a dispute between the contestants over the requirements of that law, and there is effective relief that a court can grant to resolve that dispute. That is all that the Oregon Constitution requires for a justiciable controversy. The majority errs in concluding otherwise.

**BREWER, J.,** dissenting.

The issue that the majority appears to decide is whether petitioner, which properly exercised its undisputed statutory right to appear before LUBA to challenge the county's decision in this case, now has constitutional standing to seek judicial review of LUBA's adverse decision.[1] In concluding that petitioner does not have that standing, the majority misconceives the nature of the legislature's authority to permit a nongovernmental entity to seek a judicial determination of the legality of governmental action when that entity has participated in the process that led to the action in question. Because I believe that petitioner's involvement was sufficient to give it an interest that the Oregon Constitution permits the legislature to recognize, I dissent from the majority's decision.

The legislature's broad grant of standing in ORS 197.830(2) to appeal a local land use decision to LUBA is part of its general scheme for enforcing the statewide land use system that it first enacted almost 30 years ago and that it

---

[1] I say "appears to decide" because the majority at times refers to "justiciability" without distinguishing among its various categories. For example, it seems to give some weight to cases, such as *Oregon Medical Association v. Rawls,* 281 Or 293, 574 P2d 1103 (1978), and *Oregon Cry. Mfgs. Ass'n v. White,* 159 Or 99, 78 P2d 572 (1938), that involve lack of adversity between the parties (*Rawls*) or lack of a ripe controversy (*Oregon Cry. Mfgs. Ass'n*) rather than standing. Because in this case it is clear that the parties are adverse to each other and that their dispute is ripe for decision, those cases can have no bearing on our decision. A lack of constitutionally required standing is the only aspect of justiciability that can explain the majority's decision.

has frequently reinforced since then. *See* Or Laws 1973, ch 80; ORS chapter 197. Under that system, local governmental land use decisions must comply with criteria whose ultimate source is state law, as expressed in statewide goals that the Land Conservation and Development Commission (LCDC) has adopted. To ensure that those decisions comply, the legislature provided for appeals from the local government to LUBA by any "person" who meets the standing requirements of ORS 197.830(2), including organizations like petitioner. ORS 197.015(18). It also provided that a person who appears as a party before LUBA may seek judicial review of LUBA's decision. ORS 197.850. In doing so, the legislature recognized the difficulty of relying solely on a state agency to enforce the statewide requirements in the multitude of land use decisions that local governments make. The heart of my disagreement with the majority is its failure to recognize the public policy considerations involved in the legislature's decision, including the legislature's broad discretion to determine who may challenge the legality of executive department actions, and its concomitant failure to recognize the resulting constitutional sufficiency of the legislature's conferral of standing on those persons.

It is essential to remember that this case is not a private dispute between private parties; it involves the implementation, through the action of the executive department, of a major legislative policy. Like other administrative decisions in quasi-judicial cases, it did not begin in the courts; rather it came to us fully formed from another branch of government. The Executive Department, implementing the relevant statutes and their accompanying legislative policy, has already determined the issues in the case and the parties to it. Only after LUBA, an agency of the Executive Department, completed its work could those involved seek judicial review. *See, e.g., Oregon Health Care Assn. v. Health Div.,* 329 Or 480, 992 P2d 434 (1999). Thus, the case comes to the judiciary with the issues, parties, and evidence that it had when it left the executive department. The judiciary's role is not to change those things but to determine whether the executive acted in accordance with the applicable legal requirements. *See* ORS 183.482(8). The very fact that courts refer to their role as "judicial review" rather than as an "appeal" from a

lower tribunal reflects the different nature of their involvement with administrative cases.

One aspect of administrative cases is that statutes that describe who may be a party to them govern the actions of the Executive Department before they have any effect on the judiciary. Thus, the Executive Department will simply comply with a broad legislative grant of standing to appear before an administrative agency; so far as the Executive Department is concerned, there are no constitutional problems. A number of statutes contain such broad grants. As noted, ORS 197.830(2), which permits a person to challenge a land use decision before LUBA if the person participated before the local government, gives broad standing as a matter of right. On the other hand, ORS 183.310(6)(c), which permits an agency to allow any person to be a party to a contested case when the agency determines that the person has an interest in the case "or represents a public interest" in the result, and ORS 469.370(5), which allows the Energy Facility Siting Council to permit any person to be a party if the person participated at an earlier stage of the proceeding, give agencies discretion to grant a person standing as a party.

As ORS 183.310(6)(c) suggests, one of the purposes of a broad grant of standing at the administrative level may be to ensure that the public interest is fully represented. This is a point that the Supreme Court emphasized in *Marbet v. Portland Gen. Elect.*, 277 Or 447, 561 P2d 154 (1977). In rejecting a challenge to a private party's intervention in an energy facility siting case, it explained that ORS 469.370(5)

> "gives no greater procedural weight to an intervenor's personal self-interest than to an interest that he shares with other members of the public. It expresses the legislature's judgment that the important decisions of public policy entrusted to the Energy Facility Siting Council are not to be treated as a dispute between opposing private interests." *Id.* at 453-54.

Standing, thus, depended on the intervenor's representation of the public interest in a matter of public concern, not on the intervenor's personal stake in the decision.

Petitioner unquestionably was a proper party to the LUBA proceeding, because the legislature has determined

that persons in its position represent an important public interest. As a party, it also had *statutory* standing to seek judicial review of LUBA's final order. In this respect, ORS 197.850(1) is identical in substance to ORS 183.480(1), which permits any party to an agency proceeding—which includes any person whom the agency in its discretion recognizes as a party—to obtain judicial review of a final order.[2]

The Supreme Court has linked the requirement that a controversy be justiciable to two provisions of the Oregon Constitution: Article III, section 1, and Article VII (Amended), section 1.[3] *First Commerce of America v. Nimbus Center Assoc.*, 329 Or 199, 206, 986 P2d 556 (1999); *Barcik v. Kubiaczyk*, 321 Or 174, 188-89, 895 P2d 765 (1995). There is nothing, though, in the language of those provisions that creates the limit on legislative authority supposed by the majority. In a discussion that bears emphasis here, the leading commentators on administrative law have vigorously criticized the United States Supreme Court's construction in *Lujan v. Defenders of Wildlife*, 504 US 555, 560-61, 112 S Ct 2130, 119 L Ed 2d 351 (1992), of the "case or controversy" limitation in Article III of the United States Constitution:

> "Once the legislature has declared a form of injury legally cognizable through the process of statutory enactment, the Court's power and authority to decline to recognize that form of injury is severely limited. The Court's

---

[2] ORS 183.480(1) also permits a person adversely affected or aggrieved by a final order to obtain judicial review. That provision both creates additional grounds for seeking review and makes it clear that a party may obtain review without showing that it was adversely affected or aggrieved by the order. *See Brian v. Oregon Government Ethics Commission*, 319 Or 151, 874 P2d 1294 (1994).

[3] Article III, section 1, of the Oregon Constitution, provides:

"The powers of the Government shall be divided into three separate departments, the Legislative, the Executive, including the administrative, and the Judicial; and no person charged with official duties under one of these departments, shall exercise any of the functions of another, except as in this Constitution expressly provided."

Article VII (Amended), section 1, of the Oregon Constitution, provides:

"The judicial power of the state shall be vested in one supreme court and in such other courts as may from time to time be created by law. The judges of the supreme and other courts shall be elected by the legal voters of the state or of their respective districts for a term of six years, and shall receive such compensation as may be provided by law, which compensation shall not be diminished during the term for which they are elected."

power in this context is identical to its power to hold any statutory enactment invalid. It can hold the statute invalid only if the statute conflicts with the Constitution. This observation provides an easy answer to the hypothetical question frequently posed by administrative law scholars: Could Congress confer standing to challenge a class of government actions on all blue-eyed people? The answer is clearly 'no,' but that answer is based on the Equal Protection Clause of the Fourteenth Amendment rather than the case or controversy limitation in Article III.

"Of course, the case or controversy clause itself provides some limit on Congress' power to enact a statute that makes a form of injury legally cognizable. * * * There probably are forms of injury so abstract that Congress cannot make them legally cognizable by statutory enactment consistent with Article III. It would require an imagination more vivid even than that of most law professors to list examples, however." Kenneth Culp Davis & Richard J. Pierce, Jr., 3 *Administrative Law Treatise* § 16.8 at 51-52 (1994).

The authors further explained:

"The Court's attempt [in *Lujan*] to transpose a doctrine of judicial restraint into a judicially enforced doctrine of congressional restraint does not work. Once Congress issues a command to agencies and calls on courts to enforce that command, a judicial refusal to enforce the command can no longer be characterized as judicial restraint. It is more accurately characterized as abdication of judicial responsibility to enforce the policy decision of a politically accountable Branch." *Id.* § 16.16 at 95.

To restate the critical inquiry posed by Professors Davis and Pierce, under which provision of the Oregon Constitution is ORS 197.850(1) invalid as applied in this case? With respect, the answer is none. By giving petitioner standing to seek judicial review of LUBA's decision, the legislature has done nothing that violates the separation of powers principle expressed in Article III, section 1, or that transgresses the judicial power conferred by Article VII (Amended), section 1. It merely has exercised the authority accorded to it by Article III, section 1, to provide for the enforcement of its statutory enactments. The majority's decision, in point of fact, actually threatens the legislature's constitutional exercise of

its authority to provide for such enforcement. In that regard, it cannot be reconciled with several cases decided by the Oregon Supreme Court.

In *Marbet,* pursuant to an applicable statute, the Energy Facility Siting Council granted the petitioner party status in a proceeding involving the proposed Pebble Springs nuclear plants. On review, PGE challenged the petitioner's standing. The court rejected the challenge, pointing out that the governing statute authorized the council to permit a person to become a party if the person represented a public interest in the result, without regard to the person's individual interest. After pointing out that important issues of public policy raise considerations that are different from those involved in private disputes between private parties, the court held that Marbet had standing to seek judicial review not only of issues that arose from his individual intervention but of all issues in the case. 277 Or at 455-57.

In *Jefferson Landfill Comm. v. Marion Co.,* 297 Or 280, 284, 686 P2d 310 (1984), the court construed ORS 197.830(3) (1983), which was the predecessor to the current version of ORS 197.830(2). Under the earlier version, a person could seek LUBA review of a quasi-judicial land use decision if the person had appeared before the local government orally or in writing and either was entitled to notice of the hearing or was "aggrieved or has interests adversely affected by the decision." The issue that the court decided was what was necessary to show that the party was aggrieved under the statute. The court concluded that a showing was sufficient if:

"1.   The person's interest in the decision was recognized by the local land use decision-making body;

"2.   The person asserted a position on the merits; and

"3.   The local land use decision-making body reached a position contrary to the position asserted by the person." *Id.* (footnote omitted).

In the absence of an express determination to the contrary by the local body, the court assumed that a person who appeared before it and asserted a position on the merits had a recognized interest in the outcome and thus would be aggrieved by

an adverse decision. Nothing in *Jefferson Landfill* suggests that the court believed that the statutory meaning of "aggrieved" required less of an interest than it would when used for constitutional purposes.[4]

In *People for Ethical Treatment v. Inst. Animal Care*, 312 Or 95, 105, 817 P2d 1299 (1991), the court explained why the petitioner, despite the fact that it had advocated actively before the agency and lost, lacked standing under ORS 183.480(1) to enforce the agency's statutory quorum requirements.[5] It first noted that "PETA has not asserted an interest different from that of the general public, *i.e.*, PETA is a bystander, and the interest of the general public is not enough to give PETA standing." *Id.* at 104. The petitioner also argued that it was aggrieved because it had actively participated in the agency proceeding, even though it was not a party. In response, the court said:

> "This participation test is explicit in our land use decisions on standing for an 'aggrieved' person. [*Jefferson Landfill*, 297 Or at 284]; *Benton County v. Friends of Benton County*, *supra*, 294 Or [79,] 86[, 653 P2d 1249 (1982)]. However, *Benton County* was a land use case. [*Marbet*] does not imply standing for anyone who may participate in a hearing before an agency. PETA's attempt to incorporate the test for standing under land use statutes into the APA generally is not well taken. This court has stated that standing as an 'aggrieved' person in land use proceedings is broader than that under the Oregon APA. *See Jefferson Landfill*[,] 297 Or at 284-86. Although the legislature may use the same words to describe the scope of standing under two different statutory schemes, the 'criteria are by no means uniform or consistent.' [*Benton County*], 294 Or at 82. Land use decisions, and the criteria for standing to seek review of these decisions, are *sui generis*." *Id.* at 105.

---

[4] In *Jefferson Landfill*, no party contended that ORS 183.480(1) confers standing that exceeds the judicial power of the state that Article VII (Amended) of the Oregon Constitution confers on the courts. Because standing is a jurisdictional requirement, by its decision that the petitioner had standing to seek judicial review, the court necessarily held that the statutory grant of standing did not exceed constitutional limits. Otherwise it would have dismissed the petition on its own motion.

[5] Because People for Ethical Treatment of Animals (PETA) was not a party to the agency proceeding, it had to base its standing on being adversely affected or aggrieved by the agency's decision.

According to the majority, the court in *People for Ethical Treatment* held "that the association failed to satisfy the statutory standing requirements of the APA, ORS 183.480, because it could not demonstrate 'a personal stake in the outcome.'" 176 Or App at 539. What the court actually said was that a person is "aggrieved" under ORS 183.480(1) if the person shows one or more of three factors:

> "(1) the person has suffered an injury to a substantial interest resulting directly from the challenged governmental action; *(2) the person seeks to further an interest that the legislature expressly wished to have considered;* or (3) the person has such a personal stake in the outcome of the controversy as to assure concrete adverseness to the proceeding."
> *People for Ethical Treatment*, 312 Or at 101-02 (citations omitted; emphasis added).

According to the Supreme Court, *none* of those factors confers "aggrieved" status on persons "who merely are 'dissatisfied with the agency's order,' or who have only an 'abstract interest * * * in the question presented,' or who are mere bystanders." *Id.* at 102 (citations omitted). Given that construction, the majority's understanding of the *constitutional* "practical effect" requirement is, in effect, indistinguishable from the Supreme Court's description of the *statutory* test for an aggrieved person.[6]

As the foregoing decisions make clear, the Supreme Court has accepted legislative determinations to tie standing to seek judicial review directly to participation in the administrative proceeding as a party or statutory aggrievement. In doing so, it has recognized that administrative proceedings involve public interests, not simply disputes between opposing private parties. By deciding those cases as it did, it also has implicitly recognized that a person who has standing before the administrative agency under those criteria has constitutional standing. That is, someone on whom the legislature has conferred party status before an executive

---

[6] Once again, if aggrievement required a lesser effect than is necessary to create a justiciable claim, the court *sua sponte* would be compelled to refuse its claimant standing. *See Poddar v. Clatsop County*, 167 Or App 162, 164, 2 P3d 929, *adhered to* 168 Or App 556, 7 P3d 677, *rev den* 331 Or 193 (2000) (holding that courts must consider the issue of justiciability *sua sponte*, because it affects the court's jurisdiction to enter a judgment).

agency so that the person can represent the public interest in proceedings in that branch, or who is statutorily aggrieved by the agency's decision, has thereby acquired a sufficient interest in the outcome to call upon the courts to determine whether the Executive Department has acted legally.

The court's emphasis in *Marbet* on the public policy implications of standing to seek review of administration determinations is particularly significant in this case because of the special role that land use law has in Oregon's legal system. Land use decisions do not simply affect property owners, neighbors, and the public bodies within whose jurisdiction the land in question may lie. Rather, they arise from a legislative choice to regulate land use on a statewide basis, for the protection and benefit of the people of the state as a whole. That is why the legislature gave members of the public who actively participate in land use decisions the right both to appeal those decisions to LUBA and to seek judicial review of LUBA's actions. Even assuming that statutory standing may, in extreme circumstances, fail to satisfy state constitutional requirements, that proposition does not justify the majority's conclusion that the legislature's conferral of standing—and the legislature's determination of the state's public policy and who may enforce that policy in the courts— is irrelevant in determining whether a party has the kind of interest that will create standing. In my view, and as the Supreme Court has suggested, a general public interest that the legislature has defined as such can be enough to give rise to the "practical effect" that the majority finds necessary. That legislative policy choice neither interferes with the judiciary's ability to do its job nor brings a nonjusticiable case before it; thus, the courts are not free to supplant it.

None of the cases relied on by the majority requires a contrary conclusion. In *Rawls*, the court refused to sanction a judgment sought by parties who were not adverse that would bind nonparties with respect to the constitutionality of a statute. Not surprisingly, the court declined to enter a declaratory judgment where no controversy existed between the parties. *Rawls* did not turn on whether a judicial determination would have a practical effect on *the parties*. Instead, the court quite properly was concerned with the effect of such a determination on *nonparties*. 281 Or at 298-99.

Again, this case presents a very different set of circumstances. Nobody questions that petitioner's position is adverse to the interests of the respondents. To the contrary, if petitioner is not permitted to contest LUBA's decision, it will go unchallenged, even if erroneous. When the legislature gave broad standing to aggrieved persons, it likely had circumstances such as these in mind. Often, only organizations like petitioner will be vigilant and resourceful enough to ensure that the state's land use laws are enforced. For this court to hold that LUBA's decision has no practical effect on petitioner misses that point altogether.

Nor does *McIntire v. Forbes*, 322 Or 426, 909 P2d 846 (1996), pose a barrier to our determination that the petition is justiciable. The court's holding that the term "any interested person," as used in the Light Rail Funding Act, "at least includes a taxpayer whose tax burden will be or is likely to be increased by operation of the Act," *id.* at 432, does not govern whether LUBA's decision in this case has a practical effect on petitioner. In *McIntire*, the court simply reaffirmed its statement in *Brumnett v. PSRB*, 315 Or 402, 848 P2d 1194 (1993), that the "standing" aspect of justiciability requires that a judicial decision must have a practical effect on the rights of parties. *Id.* at 433. Although the court analyzed the justiciability of the petitioners' claims in a separate portion of the opinion from its consideration of the petitioners' statutory authority to bring a claim under the Act, it linked the two analyses with a summary declaration: "As discussed more fully elsewhere, a decision by the court will have a practical effect on the parties." *Id.* at 433-34. Because the court had no reason to consider whether a statute such as the one before us was constitutional under the circumstances present here, *McIntire* does not meaningfully assist us in determining the contours of the "practical effect" requirement.

Likewise, our decision in *Poddar* is distinguishable because it did not involve review of a legislative conferral of standing. In short, none of the foregoing cases suggests that the Oregon Constitution requires that a party seeking judicial review of a LUBA decision must satisfy a more rigorous test for standing than is necessary to prove that he or she was a party before the agency or is adversely affected or aggrieved by its decision.

As I understand the majority's holding, it ultimately reduces to the following conclusion, which epitomizes our disagreement:

"In this case, the only right conferred by ORS 197.830 and ORS 197.850 is the right to seek judicial review of a local government decision without having to establish that the decision will affect the person seeking review. That is nothing more than the conferral of the right to obtain an advisory opinion, which is beyond the authority of the legislature to grant." 176 Or App at 550.

Petitioner satisfied the requirements to seek review by LUBA of the county's decision, and to seek judicial review of LUBA's decision. Petitioner's interest was recognized by the county and LUBA; it asserted a position on the merits before those bodies. Both the county and LUBA reached a decision contrary to petitioner's asserted position. There is nothing advisory about the relief petitioner seeks on review. Petitioner lawfully invokes this court's power—indeed, its obligation—to correct an erroneous agency decision in a proceeding in which it properly was a party. Petitioner was adversely affected or aggrieved and therefore has standing to seek review of that decision. *Jefferson Landfill*, 297 Or at 284.

Because I agree with the Chief Judge's view of the merits of the petition, I likewise would remand.

I respectfully dissent.

Wollheim, J., joins in this dissent.